## STATE OF CONNECTICUT *v.* MONEL RUIZ
## (12893)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and NOVACK, Js.

Argued November 6, 1986—decision released February 17, 1987

*Joette Katz,* public defender, with whom was *Alan McWhirter,* for the appellant (defendant).

*Michael A. Fasano,* special assistant state's attorney, with whom were *Joseph A. Geremia, Jr., Patricia King,* assistant state's attorneys, and, on the brief, *John Connelly,* state's attorney, and *Walter Scanlon* and *Bradford J. Ward,* assistant state's attorneys, for the appellee (state).

SHEA, J. After a jury trial the defendant was convicted of murder in violation of General Statutes § 53a-54a. In his appeal from the judgment he claims the trial court erred: (1) in failing to suppress the identification testimony of a witness for the prosecution; (2) in permitting the state to argue that an adverse inference should be drawn from his failure to call an additional alibi witness; and (3) in denying his motion for mistrial based upon improper argument by the state. We find no error.

There is no dispute about the facts that could reasonably have been found to support the verdict. At about 6:20 a.m. on February 4, 1985, the victim, Tyrone Williams, was fatally shot in the neck as he sat in his car parked near a dumpster in the parking lot of the apartment complex where he resided in Naugatuck. A resident of the apartments, who was standing in the parking lot about forty-five yards from the victim's car, heard the shot and saw running from the scene a person whom he described as at least six feet tall and wearing dark clothes as well as a knitted hat with a cuff. This man carried in his right hand a rifle that he attempted to conceal behind his leg, and he hobbled as he ran to keep the weapon in line with his leg movements.

Another apartment resident, L, heard a "pop" noise coming from the area of the parking lot where the

dumpster was situated. Immediately she arose from her bed, put her head out the window and observed a man running by at a distance of twenty to thirty feet from her. She described him as a black male, five feet ten or eleven inches tall, of medium build, wearing a blue waist-length jacket, dark pants and a maroon knitted hat that covered half his forehead. She did not notice that he was carrying anything in his hand or running in an unusual manner. She watched him approach a blue car with its motor running parked in the street at the entrance to the driveway of the apartment building.

Later that day L helped to prepare a front view composite drawing of the man she had seen from the apartment window. The next day she was shown eight color photographs of black males. She identified none of these photographs. A similar attempt at photographic identification was made on March 6, 1985, which was also unsuccessful. No picture of the defendant was contained in these arrays, although a photograph of his stepbrother was included in each of them.

On March 13, 1985, two police officers, who regarded the defendant as a suspect but were unable to obtain a photograph of him, took L to the K-Mart Plaza in Waterbury so that she might have an opportunity to view him. The officers had learned that the defendant worked at the Pie Plate restaurant in the plaza and they knew his work schedule. They parked in the third row of cars, about thirty feet in front of the restaurant. After waiting about fifteen minutes, L asked whether she was there to view a person in the Pie Plate restaurant. She told the officers she had been in the restaurant with some neighbors a couple of days before and had seen a black male there who looked familiar, but she was not sure where she previously had seen him. She informed them that it had just occurred to her that "that might have been him." She testified that, when she had been in the restaurant on the earlier occasion,

the defendant had greeted her as she walked toward the restroom and that she had walked away from him because she did not know who he was, although he had looked familiar. She had made the connection between the person she had seen in the restaurant and the man she had seen running by her apartment before actually viewing the defendant at the shopping plaza.

After waiting in the car a while longer, L observed a black male leave the Pie Plate restaurant and come within ten or fifteen feet of the car in which she sat. She told the officers he was the man they were seeking. To provide another opportunity to observe him, the officers drove to a different location in the parking lot, near the store the person identified by L had entered. When this person, who proved to be the defendant, came out of the store, he again passed by the car. L then said that she was sure he was the man she had seen running from the scene of the murder.

Prior to his identification by L, the police had interviewed the defendant. He had been questioned at his home on the day of the murder and at the police station on the following day, following appropriate *Miranda* warnings on each occasion. See *Miranda* v. *Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant, who was sixteen years old, said that the victim was his stepfather and that at times he had struck the defendant and other children in the family without provocation. He also told the officers that he did not like the way the victim took care of his mother, E. At the trial the state presented the testimony of E that she and the victim had been separated for one and one-half years before his death.

The defendant testified in his own defense and also presented several alibi witnesses to corroborate his testimony that at the time of the murder he was at his home, about thirteen minutes by automobile from the

scene of the crime. He also presented an expert witness who testified about natural lighting conditions at the time of the murder.

I

The defendant claims that the identification of him made by L at the shopping plaza in Waterbury should have been suppressed because it resulted from impermissibly suggestive police procedures. He fails, however, to specify any action of the police that can fairly be characterized as misconduct related to the identification. He concedes that it was not improper for the police to bring L to a large shopping center for the purpose of viewing a suspect. He does not maintain that the officers accompanying her did anything to induce her to select the defendant from the many people she observed as she sat in the parked car.

The defendant does point out that, because of the impracticability of preserving the record of the identification procedure fully, it is much more difficult to review the reliability of an identification made after a public viewing than where an array of photographs has been shown to a witness. L testified that, of the twenty or thirty people she observed in the area of the car before she saw the defendant come out of the restaurant, about ten were black males, but she could not describe them or estimate their ages. This deficiency in the record available for review, however, does not render the public viewing procedure impermissibly suggestive. The police had tried unsuccessfully to obtain a photograph of the defendant for the purpose of including it in an array to be shown to L. After consulting the state's attorney, the police decided upon the viewing at the shopping plaza as the most feasible alternative. See generally *Stovall* v. *Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).

The defendant also maintains that once L had told the police about having seen a black male who looked familiar to her when she had been in the restaurant a few days earlier, the officers should have left the area and arranged some other identification procedure. He argues that the police should have realized from her remarks that she was under the impression that she had been brought to the shopping plaza to confirm a police suspicion that someone who worked at the restaurant had committed the murder. L testified, however, that, even before she saw the defendant come out of the restaurant, her memory had connected the restaurant employee she had seen a few days before with the person she had seen running from the crime. Although her remarks must have alerted the officers to the fact that L's attention undoubtedly would be focused primarily on people entering or leaving the restaurant, we are not persuaded that this circumstance rendered the identification procedure impermissibly suggestive.

The key element in this identification is that, even before seeing the defendant on that occasion, L, possibly because her recollection was stimulated when she noticed that the officers had parked in front of the restaurant she had visited a few days earlier, made the connection between the black male employee she had seen on her visit to the restaurant and the person she had observed when the crime occurred. There is no indication that any improper conduct of the police contributed to the mental process by which L had reached that conclusion prior to her actual identification of the defendant when he emerged from the restaurant. From the vantage point of hindsight, it would have been preferable for the police to have arranged a viewing of the defendant at another location, such as the school he attended or the neighborhood where he resided. We are not persuaded, however, that the failure to do so

resulted in an impermissibly suggestive identification under the circumstances.

Even if the actual identification of the defendant outside the restaurant were deemed impermissibly suggestive, its reliability is adequately supported by L's independent recollection beforehand that the murder suspect was the restaurant employee who had "looked familiar" to her when she had previously visited the restaurant. The defendant stresses the fleeting opportunity the witness had to observe the suspect from her second floor apartment window as he ran from the scene of the crime, some discrepancies between the statements she gave the police and her testimony concerning his height and build, her failure to recognize the defendant as the suspected murderer when she first saw him at the restaurant, the fact that her degree of attention when she observed the suspect running by her window may have been less than a crime victim would have exercised, and the lapse of more than four weeks before she identified the defendant leaving the restaurant. On the other hand, the witness was able, with the assistance of a detective, to make a composite drawing of the man she had seen from her window that corresponds generally with the defendant's features. She reviewed photographs of sixteen other black males, one of whom was the defendant's stepbrother, who generally resembled the defendant, and unhesitatingly rejected them as picturing the suspect. Her initial description of the vehicle toward which she saw the suspect run as a dark blue medium-sized car with a hatchback type rear window matched the automobile that the defendant's mother had leased from a car rental agency and that the defendant and his stepbrother returned the day after the crime occurred. She also demonstrated a high level of certainty about her identification once she had sufficiently viewed the defendant at the shopping plaza. We conclude that

under all the circumstances the trial court did not err in permitting L's identification of the defendant to be presented to the jury.

## II

An alibi witness, A, testified that he had visited the defendant at his home at 6:30 a.m. on February 4, 1985, about ten minutes after the estimated time of the murder. The defendant's mother, E, answered the door when A entered the apartment. A awoke the defendant, who had been sleeping. After obtaining some money that the defendant owed him, he left the defendant's apartment and returned to his home.

Before commencement of final arguments, the court informed counsel that it intended to charge the jury that an adverse inference could be drawn from the failure of the defendant to call E, his mother, in support of A's testimony that he had found the defendant asleep when he visited his apartment at about the time of the murder. The defendant objected on the ground that E had been equally available to both sides as a witness during the trial and also that her testimony would be cumulative. The court remained, nevertheless, of the opinion that an adverse inference charge was in order and later gave the charge substantially as requested by the state,[1] to which the defendant excepted. During its summation the state argued that the failure of E to testify in corroboration of A's claim

---

[1] This portion of the charge was as follows: "Now, in this case you may draw an unfavorable inference against the defendant for not producing his mother [E] to testify regarding answering the door and allowing [A] in the apartment to get some money from the defendant at 6:30 a.m. on February 4th, 1985.

"You may draw an inference that the witness's testimony would have been unfavorable to the defendant because if you find that, one, the witness was available and, two, the witness was one the defendant would naturally have produced."

that he had found the defendant in his apartment at about the time of the murder indicated that "it didn't happen."[2]

"The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." *Ezzo* v. *Geremiah,* 107 Conn. 670, 677, 142 A. 461 (1928); see also *State* v. *Hart,* 198 Conn. 424, 428, 503 A.2d 588 (1986). "There are two requirements for the operation of the rule: The witness must be available, and he must be a witness whom the party would naturally produce." *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). The defendant does not contest the basis for finding that the first of these requirements was satisfied. He claims that the second requirement was not fulfilled, however, because: (1) E's testimony would have been cumulative; (2) she was equally available to the state as a witness; and (3) her credibility had been significantly impaired when the state, which had called her as a witness concerning her relationship with the victim, her estranged husband, had been permitted to attack her credibility by using her prior inconsistent statements.

We disagree with the defendant's assertion that E's testimony would have been merely cumulative. A's alibi testimony was significant in that it placed the defendant in his home at the approximate time of the murder. If the jurors had credited that testimony, they could not reasonably have convicted the defendant. The

---

[2] The principal focus of the defendant's attack on references to the absence of testimony by E in support of her son's alibi is upon this argument of the state rather than upon the instruction given by the court. There is no significant difference, however, between the argument and the instruction. Our conclusion that the instruction was proper also means that we find no impropriety in this argument of the state.

failure to call E to corroborate A's testimony that at such a critical time she had opened the door for him to enter her apartment in order to visit the defendant was an important circumstance to call to the attention of the jury. The testimony of an additional witness upon a significant disputed issue can hardly be characterized as cumulative. *State* v. *Reid,* 193 Conn. 646, 662, 480 A.2d 463 (1984).

We also reject the defendant's argument that the undeniable opportunity each party had to call E to the stand negates the view of the trial court that it would have been natural for the defendant to have used her as a witness to support his alibi. Though each party ordinarily is empowered to place an available witness on the stand, such a witness often may be expected to furnish testimony more favorable to one side than the other. Id., 662–63; see *Russell* v. *Dean Witter Reynolds, Inc.,* 200 Conn. 172, 191, 510 A.2d 972 (1986). In this case E's relationship to the defendant, her son, as well as her presence in the apartment at the time of A's visit, which indicated that she could probably have strengthened his defense of alibi if A's testimony were true, plainly justified the court's view that the defendant would naturally have presented his mother's testimony if it would have helped his case.

The defendant's further contention that the state's cross-examination of E concerning her prior inconsistent statements had so impaired her credibility that it might have been more harmful than helpful to call her as a witness assumes that considerations of trial strategy may preclude an otherwise appropriate adverse inference instruction. We do not equate the requirement that the witness be one whom a party would *naturally* produce with the judgment of counsel that the witness would be effective. In any event, it is not a certainty that the jury would have applied the falsus in uno, falsus in omnibus principle to testi-

mony E might have given in support of her son's alibi. The absence of her testimony on such a significant issue was appropriately called to the attention of the jury.

## III

The claim that the court should have granted the defendant's motion for a mistrial is based upon references during the state's summation to the testimony of Detective Peter DeStiso. He testified that E had told him that the victim had been living with another woman at the time of his death, that he would become violent when intoxicated and would strike her children for no reason, that two weeks before his death the victim had quarrelled with her at a shopping place and had tried to choke her, causing her to stab him with a knife in order to defend herself, and that the defendant was her favorite child and would do anything for her. The court had admitted this hearsay evidence for the limited purpose of impeaching E's credibility after she had denied making these statements to the detective. The jury had been instructed at the conclusion of this portion of DeStiso's testimony that the statements E had made to him had been admitted only to attack her credibility and "not for the truth" of them.

During the state's initial argument, Assistant State's Attorney Patricia King, after referring to the testimony of another witness concerning problems between the victim and his wife E, also began to mention DeStiso's testimony about his interview with E. Defense counsel objected at her first reference to DeStiso, but the court denied his request to excuse the jury, saying that it would "handle that in due course." King then completed the sentence that had been interrupted after her reference to the testimony of the detective: "that the defendant's mother had told Detective DeStiso that there had been problems in the relationship, certain specific problems." King made no further reference to any

statements of E that had been admitted only for impeachment. At the conclusion of her argument, the court gave a special instruction to the jury that the testimony about E's statements to DeStiso had been admitted only to impeach her credibility and could not be used to show motive.

Assistant State's Attorney Walter Scanlon delivered the closing argument for the state. In arguing that the defendant had murdered the victim for his mother, he also referred to the testimony of DeStiso that had been admitted only for impeachment: "the mother had told him that this boy would do anything for her." Once more defense counsel objected, but the court merely declared: "I'm going to inform the jury on that again. You may continue, sir." Scanlon then proceeded: "I submit that the evidence in this case shows that he did the ultimate for his mother." Later Scanlon characterized the crime as a "joint venture" on the part of the defendant and his stepbrother "to satisfy the vindictiveness of their mother." Again the court did not respond directly to the objection of defense counsel but said the jury would later be addressed on that subject. At the conclusion of the argument, when the jury had been excused, defense counsel moved for a mistrial based upon the references by the state to E's hearsay statements to the detective as evidence of motive. The court denied the motion, declaring its intention to instruct the jury in order to "correct any potential harm that can befall the defendant." The charge to the jury again warned that the testimony concerning E's statements to DeStiso had been admitted only to impeach her and not to prove the underlying facts relating to motive.

The defendant claims that the references by the state during argument to E's hearsay statements as evidence of motive were not only improper but also violated his due process right to a fair trial. He contends

further that these remarks constituted defiance of the trial court's rulings sufficiently flagrant to invoke the supervisory authority of this court to deter prosecutorial misconduct that offends a sound judicial process.

With respect to the defendant's constitutional claim of improper argument, "the touchstone of due process analysis in cases of prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Couture,* 194 Conn. 530, 562, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). In this case there was competent evidence from other witnesses that the motivation for the murder was the antipathy of E and the defendant toward the victim arising from his separation from his family. B testified that the victim had been living with her for one and one-half years before his death. In his interview with the police after the murder, the defendant said that his stepfather had struck him and the other children without provocation and that he did not like the way the victim took care of his mother. E herself testified that she and her husband had been separated for one and one-half years "because he wouldn't help me out in the house," that he was "not a good provider," and that the defendant was her favorite child because he generally obeyed her, helped around the house and stayed out of trouble. There was also evidence that she had leased the car claimed to have been used by the murderer, which the defendant and his brother had returned to the car rental agency. Detective Neal O'Leary testified that the defendant had told him that he had not "got along" with his stepfather.

It appears, therefore, that the reference by King to E's statement to DeStiso, "that there had been problems in the relationship, certain specific problems," informed the jury of no facts that were not amply sup-

ported by other witnesses whose testimony had been introduced for substantive purposes. The reference by Scanlon to DeStiso's testimony that E had said that the defendant "would do anything for her," however, goes well beyond her testimony that "he'd do most of what I say" and help her with the other children. This transgression, nevertheless, was harmless beyond a reasonable doubt in view of all the other evidence of motive in the case. Additional remarks of Scanlon challenged as improper, that the defendant "did the ultimate for his mother" and that the crime was a "joint venture" with his stepbrother "to satisfy the vindictiveness of their mother," while flamboyant, are at least arguable inferences based upon evidence not necessarily implicating the statements of E that had been admitted only for impeachment. Apart from the single reference to DeStiso's testimony concerning the defendant's loyalty to his mother, the remarks do not exceed permissible limits for rhetorical hyperbole by counsel engaged in advocating a cause under our adversary system.

In any event, the rule of evidence precluding the substantive use of prior inconsistent statements, which lies at the heart of the prosecutorial misconduct relied upon, is not of constitutional dimension. *California* v. *Green,* 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). "[T]here is good reason to conclude that the Confrontation Clause is not violated by admitting a defendant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." Id. This court has recently sanctioned the substantive use of prior statements of a witness made under prescribed safeguards that enhance their reliability.[3] *State* v. *Whelan,* 200

---

[3] In *State* v. *Whelan,* 200 Conn. 743, 753–54, 513 A.2d 86, cert. denied, 479 U.S.    , 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), this court approved the substantive use of prior written inconsistent statements, signed by a

Conn. 743, 753–54, 513 A.2d 86, cert. denied, 479 U.S.
, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). We con-
clude, therefore, that the defendant's claim of a viola-
tion of his constitutional right of fair trial is unfounded.

The defendant also contends that the state's repeated
attempts to have the jury consider the impeachment
evidence as proof of motive constituted a deliberate
defiance of the trial court's authority, so that this court
should invoke its supervisory authority over the con-
duct of attorneys in the trial courts by setting aside
the conviction as a sanction. "Where a prosecutor in
argument interjects remarks deliberately intended to
undermine the rulings of the trial court to the preju-
dice of the defendant, his conduct is so offensive to the
sound administration of justice that only a new trial
can effectively prevent such assaults on the integrity
of the tribunal." *State* v. *Ubaldi,* 190 Conn. 559, 575,
462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct.
280, 78 L. Ed. 2d 259 (1983). Reversal of a conviction
under our supervisory powers, however, should not be
undertaken without balancing all of the interests
involved: the extent of prejudice to the defendant; the
emotional trauma to the victims or others likely to
result from reliving their experiences at a new trial;
the practical problems of memory loss and unavaila-
bility of witnesses after much time has elapsed; and the
availability of other sanctions for such misconduct.
*United States* v. *Hasting,* 461 U.S. 499, 505–507, 103
S. Ct. 1974, 76 L. Ed. 2d 96 (1983); *State* v. *Ubaldi,*
supra, 572. The minimal prejudice the defendant may
have suffered from the references during argument to
the impeachment testimony in this case plainly renders
the sanction of reversal inappropriate.

declarant having personal knowledge of the facts stated, when the declar-
ant testifies at trial and is subject to cross-examination. In the present case
it is not clear from the transcript whether E's out-of-court statements to
the police officer were contained in a document that she had signed.

We must, nevertheless, consider whether the prosecutorial misconduct claimed by the defendant warrants some disciplinary sanction against the attorneys for the state. "A judge should take or initiate appropriate disciplinary measures against a . . . lawyer for unprofessional conduct of which the judge may become aware." Code of Judicial Conduct, Canon 3B (3). The isolated reference by King to DeStiso's testimony that E had told him of "problems in the relationship, certain specific problems" was wholly innocuous in view of E's testimony and that of others concerning the separation. These remarks of King cannot fairly be viewed as an attempt to bring before the jurors anything significant that they were not entitled to consider. Her improper reference to DeStiso may well have been inadvertent.

Scanlon's comment that E had told DeStiso the defendant "would do anything for her" was less excusable. Juxtaposed as it was to Scanlon's next remark, that the defendant "did the ultimate for his mother," greater impact may have been intended. There is also less reason to suppose the reference to DeStiso was inadvertent since Scanlon must have been alerted by the interruption of King's argument that use of the impeachment evidence as proof of motive would be improper. The fact that the trial court did not act more decisively, however, does extenuate Scanlon's culpability in some degree. If the objections of defense counsel that interrupted King when she referred to DeStiso had been sustained and an appropriate caution issued to refrain from further mention of the impeachment testimony, Scanlon's later reference thereto could well be viewed as deliberate defiance of the court. Instead, the court chose to deal with the situation simply by giving a curative instruction to the jury. Again, after Scanlon had made his more damaging reference to the impeachment testimony, the court failed to prohibit any

further allusion thereto, stating its intention to deal with the matter in its charge to the jury, as it later did. It was undoubtedly error on the part of the trial court not to sustain immediately the defendant's seasonable objection to Scanlon's improper remark concerning E's statement to DeStiso, rather than defer corrective measures until afterward, thus affording an opportunity for counsel to complete the offensive argument. *State v. Couture*, supra, 565. The court should have excused the jury, as the defendant had earlier suggested, and made it crystal clear that no further reference to the impeachment testimony for its content would be tolerated and that even inadvertent references to improper matters during argument were unprofessional. Although the court in charging the jury again pointed out the limited purpose for which E's statements could be used, this cautionary instruction was not a sufficient judicial response to the defendant's objection. Curative instructions, though salutary, can never completely eradicate the effect of bringing improper matters before a jury. Id., 563. As we have previously indicated, however, the error was harmless in view of the ample evidence, apart from E's statements, that the defendant had a strong antagonism toward the victim arising from the manner in which the victim had treated his family.

Despite the court's failure to respond adequately to the defendant's seasonable objection by expressly banning further mention of the impeachment testimony as evidence of motive, Scanlon made no additional reference thereto. The trial court did not believe that Scanlon was attempting to defy its authority and apparently accepted his explanation, advanced when the defendant moved for a mistrial at the conclusion of the summation, that he did not intend to implicate the impeachment testimony in arguing the motive for the killing. From our more remote viewpoint, we cannot

say that the trial record demonstrates the kind of flagrant misconduct that would require intervention by an appellate court to remand the case to the trial court for consideration of whether Scanlon's conduct should be referred to a grievance committee for possible disciplinary action. See Code of Judicial Conduct, Canon 3B (3).

There is no error.

In this opinion the other justices concurred.