STATE OF CONNECTICUT *v.* DANIEL L. GREENE
(13373)

HEALEY, SHEA, GLASS, COVELLO and HULL, Js.

Argued October 14—decision released December 27, 1988

*John F. Kavanewsky, Jr.,* for the appellant (defendant).

*James M. Ralls,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Susan Marks,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. In this appeal, the defendant makes four claims of error in his trial on robbery charges. The defendant was charged with robbery in the first degree and accessorial liability for robbery in violation of General Statutes § 53a-134 (a) (2)[1] and Gen-

---

[1] General Statutes § 53a-134 (a) (2) provides: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon."

eral Statutes § 53a-8,[2] respectively, in two separate informations. The defendant pleaded not guilty and the informations were consolidated for trial by jury. After a three day trial, the defendant was found guilty as charged in each information and the court sentenced him to the custody of the commissioner of correction for two ten year terms, to be served concurrently, suspended after eight years, followed by five years probation.

The jury could reasonably have found the following facts. On January 25, 1987, at approximately 7 p.m., a white male clad in a trench coat, ski mask and gloves entered Peretta's Quick Stop Deli in Milford. Inside the store were a clerk, Laura Gellatly, and Clayton Belmont, a frequent customer. Upon his entrance, the masked man said something to gain the attention of the clerk, who was hanging up the phone. When she turned to face him, he brandished a long-barreled weapon. Gellatly gave approximately $250 to the robber, who then ripped the phone out of the wall and left. Gellatly was able to see most of the perpetrator but not his feet. At trial, she described the ski mask and coat in fair detail.[3]

On the morning of January 27, 1987, David Blakesly, who frequently stopped at Perretta's Deli, noticed a strange looking object on the side of the road approximately one mile from Perretta's Deli. On his way home that evening, he stopped and picked up the object and

[2] General Statutes § 53a-8 provides: "CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] During the trial, the store clerk also described the defendant's complexion and eyes as she saw them through the opening in the mask. She also described the gun used in the robbery and identified a similar looking gun in court.

discovered it to be a pair of sneakers balled up in a ski mask. Knowing that Perretta's recently had been robbed and having an idea of what the robber had worn, Blakesly turned over the sneakers and the mask to the owner of Perretta's on the morning of January 28, 1987. These items later were identified by Gellatly and Belmont as similar to the mask and sneakers worn by the robber at Perretta's.

Three days after the first robbery, on January 28, 1987, at approximately 8 p.m., a mustached man wearing a blue ski mask with yellow stitching, a long trench coat and gloves entered the Melba Pharmacy in Milford. The man asked the store clerk, Lisa Rucco, to open the cash register and give him the money. At some point during this incident the robber displayed a gun that Rucco described in her statement to the police as a "rifle." Rucco gave the robber about $400 and one check made out to the pharmacy. The robber then left the store. At the time the robber was leaving the Melba Pharmacy, David Ponelli was driving westbound on Melba Street. He saw a man wearing a trenchcoat and a dark ski mask with light highlighting around the eyes and nose run from the pharmacy. At trial, he identified a mask and coat that looked similar to those worn by the fleeing man. The man appeared to be carrying a weapon. Ponelli believed that it was a shotgun with a pistol grip. Ponelli followed the masked man in his car, losing sight of him once, to a condominium complex under construction where Ponelli noticed a man crouching as if to observe something. Ponelli then recognized the crouching man to be the person who had run from the pharmacy. A "beat up" late model Cadillac pulled up behind Ponelli and the crouching man ran out and got into it. Ponelli returned to the pharmacy and told the police what he had observed.

A short time later, Officer Patrick Dooling of the Milford police department pulled over a late model Cadil-

lac matching a description given over the police radio and presumably based on information from Ponelli. The defendant and David Girard were in the stopped car.[4] Dooling found three shotgun shells on Girard during his pat down for weapons. Later that night, Dooling with the help of Ponelli located near the condominium project some of the money and the check stolen from the Melba Pharmacy.[5]

The defendant's first claim of error is that the trial court erred in consolidating the two informations for trial. The defendant argues that the joinder of these offenses prejudiced him in that the jurors were unable to keep the evidence of these offenses separate in their minds because the charges arose from factually similar but legally unrelated incidents. Thus, he claims that they may have convicted him of one crime by using evidence from the other.

The purpose of joinder, as authorized by General Statutes § 54-57[6] and Practice Book § 829,[7] is to foster economy and expedition of judicial administration. *State v. Schroff,* 198 Conn. 405, 409, 503 A.2d 167 (1986); see *State v. King,* 187 Conn. 292, 296–98, 301, 445 A.2d

---

[4] David Girard pleaded guilty to charges stemming from both of the robberies in question.

[5] Later that evening, Detective Kevin Calderwood executed a search warrant at the defendant's home and recovered a loaded pistol grip shotgun wrapped in a trench coat liner underneath the back porch. He also found two pairs of gloves outside the house, and inside the house he found a shotgun shell and a ski mask that later was identified by Ponelli as being similar to the one worn by the Melba Pharmacy robber.

[6] General Statutes § 54-57 provides: "JOINDER OF OFFENSES OF THE SAME CHARACTER. Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

[7] "[Practice Book] Sec. 829. ——TRIAL TOGETHER OF INDICTMENTS OR INFORMATIONS

"The judicial authority may, upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together."

901 (1982).[8] Joinder of offenses is, however, not permissible if it will result in " 'substantial injustice' " to the defendant. *State* v. *Boscarino,* 204 Conn. 714, 721, 529 A.2d 1260 (1987), quoting *State* v. *King,* supra, 302; see *State* v. *Schroff,* supra; *State* v. *Rodgers,* 198 Conn. 53, 65, 502 A.2d 360 (1985); A. Spinella, Connecticut Criminal Procedure (1985) p. 415, citing *State* v. *Silver,* 139 Conn. 234, 240, 93 A.2d 154 (1952).

The trial court has broad discretion in ordering the joinder of offenses and such an order will not be disturbed unless the court's discretion has been "manifestly abused." *State* v. *Pollitt,* 205 Conn. 61, 68, 530 A.2d 155 (1987); *State* v. *Boscarino,* supra, 720–21; *State* v. *Rodgers,* supra, 63; *State* v. *Bell,* 188 Conn. 406, 411, 450 A.2d 356 (1982); *State* v. *Jonas,* 169 Conn. 566, 570, 363 A.2d 1378 (1975); see Project, District of Columbia Court of Appeals Project on Criminal Procedure, Joinder and Severance, 26 Howard L.J. 1104, 1105 (1983) ("joinder is the norm"). In establishing a manifest abuse of discretion, the defendant has a difficult burden of proof in showing substantial prejudice. *State* v. *Boscarino,* supra, 721; *State* v. *Rodgers,* supra; *State* v. *Bell,* supra, 410–11; *State* v. *King,* supra; see Project, Criminal Procedure, Joinder and Severance, 76 Geo. L.J. 784, 785–86 (1988) ("To prevail on appeal under [federal] rule 14, a defendant must demonstrate that the trial court's refusal to sever was an abuse of discretion resulting in specific and compelling prejudice. A defendant's allegation that he would have had a better chance of acquittal is insufficient to find error in denying severance."). The defendant must also show that any prejudice is "beyond the curative power of the court's instructions." *State* v. *King,* supra.

---

[8] The state also suggested that joinder benefits the defendant because he can have his slate wiped clean by one judicial proceeding. We can assume by the defendant's objection to the joinder that he does not see joinder as beneficial, at least in this case.

There are a number of ways by which defendants traditionally have challenged the joinder of offenses. In *State* v. *Boscarino,* supra, this court stated that the nature of the charges against the defendant may be important in determining prejudice by joinder. If there is "brutal or shocking" evidence in one of the cases, it could affect the jury's decision in the other. Id., 723 (evidence of rapes). In this case, however, the evidence offered for both offenses was similar, and although the charges are serious, the evidence offered was not shocking and would not incite the passions of the jurors so as to prejudice the defendant as he claims. Additionally, because the trial only lasted three days, the duration of the factfinding process was not sufficient to create complexity that might have confused the jury. See *State* v. *King,* supra.

The defendant also contends that the charges against him arose from factually similar but legally unrelated incidents, and, thus, under the reasoning of this court in *Boscarino,* there was an enhanced risk of prejudice and the trial court erred in joining the informations. The defendant readily concedes that the robberies at issue here are factually similar. Both stores that were robbed were small, retail establishments; both victims were female; both robberies occurred in Milford, in the early evening, in the same vicinity; and each robber wielded a shotgun and wore a knit ski mask, a trench coat and gloves. We disagree, however, with the defendant's contention that the two robberies were coincidentally factually similar events.

The trial court properly joined the two cases for trial because, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other. Although evidence of other crimes or uncharged conduct is not admissible to show bad character or a disposition to commit a crime, such evidence is admissible to show such issues as a common scheme,

intent, malice, identity, motive or opportunity. *State v. Boscarino,* supra, 722; *State v. Brown,* 199 Conn. 47, 56, 505 A.2d 1225 (1986); *State v. Shindell,* 195 Conn. 128, 133, 486 A.2d 637 (1985); *State v. Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982); A Spinella, supra, pp. 417–18; C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 8.3.2. Of course, this evidence must be relevant and material to an element of the crime and its probative value must outweigh its prejudicial effect. *State v. Howard,* 187 Conn. 681, 685, 447 A.2d 1167 (1982); *State v. Falby,* 187 Conn. 6, 23, 444 A.2d 214 (1982); C. Tait & J. LaPlante, supra, § 8.3.2 (c). It is "[b]ecause of the difficulties inherent in this balancing process" that the trial court will be reversed only when there is a manifest abuse of discretion. *State v. Howard,* supra.

In this case, the many factual similarities of each case reasonably could have tipped the balancing process in favor of admissibility to show a common scheme. The robberies were committed by nearly identically dressed men, using identical weapons, robbing similar establishments at similar times of day within three days of each other and in the same vicinity. The similarity of the evidence of these crimes is equal to or greater than evidence properly admitted in other cases to show a common scheme.

For example, in *State v. Mandrell,* 199 Conn. 146, 506 A.2d 549 (1986), we upheld a trial court's admission of evidence of a prior armed robbery in a robbery trial. The two robberies were similar in the following respects: Both took place in liquor stores on Asylum Avenue in Hartford; both perpetrators were black men; in each robbery, the perpetrator used profanity and aggressive behavior; and in both cases, the clerks were instructed to lie down in back rooms and were struck twice with liquor bottles. The incidents were dissimilar in that a gun was openly displayed in the first rob-

bery and not in the second; the robberies occurred five years apart and at different times of day; and the bottles with which the clerks were struck were of different sizes. In the present case, the modus operandi of the two robberies was at the very least as similar as that in *Mandrell,* and in this case, the robberies occurred only three days apart.

Further, in *State* v. *Braman,* 191 Conn. 670, 469 A.2d 760 (1983), this court also found no error in the admission of evidence of a prior robbery. The following evidence was similar in the two robberies: "Both establishments were bars; the bars were located in adjoining towns; two persons participated in each robbery; the weapons used in each were a shotgun with cut-down configuration and a small automatic pistol; in both instances, the robber with the shotgun assumed the leadership role; the employees and patrons in each instance were ordered into back rooms of each bar; and the incidents were close in point of time." Id., 678. The defendant in *Braman* pointed out the following dissimilarities: In the second robbery, the perpetrators were masked and of opposite sexes; the robberies occurred at different times of day; the perpetrator with the pistol performed different tasks in each robbery; and the second robbery was planned while the first was spontaneous. Id. Again, the similarities in the present case compare favorably to those in *Braman* and, therefore, it was not a manifest abuse of discretion to join the cases and admit evidence of both crimes. Much of the evidence from either crime would have been admissible to show a common scheme at the trial of the other even if they had been tried separately. See also *State* v. *Howard,* supra, 686–87; *State* v. *Nardini,* 187 Conn. 513, 518–19, 447 A.2d 396 (1982); *State* v. *Falby,* supra, 23; *State* v. *Gilnite,* 4 Conn. App. 676, 680–81, 496 A.2d 525 (1985), aff'd, 202 Conn. 369, 521 A.2d 547 (1987).

The defendant next contends that the state commingled evidence of the two offenses in its case-in-chief, thereby enhancing the risk of prejudice by confusing the jury. The defendant claims that the state did not present its witnesses in chronological order and that this created confusion that caused the jury to use evidence of one offense to convict the defendant of the other. While the state concedes that the witnesses at trial were not presented in strict chronological order,[9] we conclude that testimony need not be presented in chronological order to withstand an attack on its potential to confuse the jury.

The order of the state's witnesses and the nature of their testimony was as follows: Gellatly (Perretta robbery); Belmont (Perretta robbery); Ponelli (Melba robbery); Dooling (arrest after Melba robbery); Rucco (Melba robbery); Blakesly (Perretta robbery); Calderwood (execution of search warrant); and Graham (operability of weapon). Contrary to the assertion in the defendant's brief, Dooling did not testify about the Perretta robbery. As the state concedes, only Blakesly's testimony was out of chronological order. Furthermore, a review of the transcript reveals that the testimony of each of the state's witnesses was not complex. Therefore, the state's case-in-chief was not presented in a manner that would confuse the jury in a trial of the joined offenses.[10]

Finally, the defendant maintains that the prejudice from joining the offenses was beyond the curative power of the court's jury instructions. The defendant claims that the trial court made only one isolated

---

[9] The state concedes that only the testimony of Blakesly, regarding the evidence that he found from the first robbery, was presented out of chronological order.

[10] The lack of confusion in the state's presentation of its case-in-chief is bolstered by the defendant's failure to object at trial. Presumably, if the state's case was confusing, it would have been apparent at that time and defense counsel would have objected.

remark in its final jury instructions to keep the evidence of each offense separate and contends that this was inadequate. We disagree.

The assertion that the trial court made only one isolated remark about the separateness of the offenses is inaccurate. In fact, there is slightly more than one full page of instructions on this subject in the transcript.[11] These instructions stressed the requirement that the jury treat each case as a separate and distinct trial and that evidence of guilt of one robbery should

---

[11] The court's instruction to the jury was as follows: "In this case, the accused is charged in two informations with separate and distinct offenses of Robbery in the First Degree. The State charges that the accused did commit a robbery or aided in such, on January 25, 1987, at Peretta's Quick Stop Deli, and on January 28, 1987, at the Melba Pharmacy, both businesses being located in the town of Milford. Our law permits the joint trial of two separate offenses. However, I must caution you, the evidence of guilt of one robbery may not be considered by you as evidence of guilt of the other. That is, you are to consider each information as a separate and distinct case, wherein the State must prove each element of each case, beyond a reasonable doubt, by separate and distinct evidence. You may not infer that because you may find the State proved the accused committed one robbery beyond a reasonable doubt, that he must have committed the other, or that he is a person of bad character and more likely to have committed the other alleged crime. Again, I charge you, that you must consider each case separately and the evidence or lack of evidence in each case, may not be considered in determining that the State proved its case beyond a reasonable doubt in the other case. You are to treat each case as a separate and distinct trial, unrelated to the other, as far as the State's burden of proof is concerned. However, where there is physical evidence, which you find by separate evidence, is related to both alleged crimes, then you may consider such evidence as it relates to both crimes. And, as I recall, the State claims that the shotgun in evidence was used in commission of both crimes. If you find beyond a reasonable doubt, that there is seaprate and distinct evidence in each case, that the one weapon was used in each crime, then you may consider such single piece of evidence as to whether it was used in each robbery."

In addition, in instructing the jury on the possible verdicts that it might return, the court told the jury that there were four possible verdicts, and that it could find the defendant guilty or not guilty on each of the two offenses.

not be considered as evidence of guilt of the other. Unlike our finding in *Boscarino,* the curative instruction in this case, in light of any minimal prejudice that may have resulted from joinder, was sufficient to protect the rights of the defendant.[12] Therefore, we find no error in the trial court's discretionary decision to join the two offenses in this case.

The defendant next contends that the trial court erred by instructing the jury that it could draw an adverse inference from the defendant's failure to produce certain alleged alibi witnesses. The state claimed that there was evidence from which the jury might draw an inference adverse to the defendant because the defendant did not call one or another of his sisters to testify that the defendant had been at his parents' house about the time of the Perretta robbery. He claims that his sisters were not witnesses whom he would naturally have produced and that the testimony of either of them would have been cumulative and, thus, that the court erred in instructing the jury that it could draw an adverse inference. We disagree.

The consequences of not calling available and presumably favorable witnesses in Connecticut is governed by the well known *Secondino* instruction. In *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960), we stated: " 'The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' " *Ezzo* v. *Geremiah,* 107 Conn. 670, 677, 142 A. 461 (1928). It is logical to conclude that if a party does not call an

---

[12] We maintain that "[t]he jury is presumed, in the absence of an indication to the contrary, to have followed the instructions of the trial court." *State* v. *Moye,* 199 Conn. 389, 396, 507 A.2d 1001 (1986).

available witness who presumably would have favorable testimony, the missing witness in fact has unfavorable information.

Two conditions must be met to trigger the negative inference under the *Secondino* rule. " 'The witness must be available, and he must be a witness whom the party would naturally produce.' " *State* v. *Shashaty*, 205 Conn. 39, 43, 529 A.2d 1308 (1987); *Secondino* v. *New Haven Gas Co.*, supra. "A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." *Secondino* v. *New Haven Gas Co.*, supra.

At his trial, the defendant called his father as an alibi witness and his father testified that he believed that two of his daughters had been at his house along with the defendant on the night of the Perretta robbery. The defendant's mother also testified that one of the daughters might have been at the house that night. The defendant did not call any of his sisters to corroborate his alibi defense.

The first prong of the *Secondino* test is not at issue in this case. The defendant concedes that his sisters were living in the area at the time of the trial and thus were available. The defendant contends that the second prong was not satisfied and claims that he would not naturally have called his sisters as witnesses and that neither could have offered "superior" testimony.

The defendant also insists that he would not naturally have called his sisters because their testimony would have been cumulative. In doing so, the defendant aptly states that he must distinguish recent holdings of this court in *State* v. *Ruiz*, 202 Conn. 316, 521

A.2d 1025 (1987), and *State* v. *Reid,* 193 Conn. 646, 480 A.2d 463 (1984). He has not done so.

In *State* v. *Ruiz,* supra, the defendant was tried on a murder charge and as part of an alibi defense he called "A." "A" testified that he had visited the defendant at the defendant's home about ten minutes after the estimated time of the murder. Id., 323. The scene of the murder was about thirteen minutes by automobile from the defendant's home. Id., 319–20. "A" testified that upon his arrival at the defendant's home, "E," the defendant's mother, had greeted him. "A" further testified that he woke up the defendant. The defendant did not call "E" to corroborate this version of events.

Over the defendant's objection, the trial court gave a *Secondino* instruction. One of the defendant's bases for claiming error in the *Secondino* instructions was that "E's" testimony would have been cumulative and thus the instruction was inappropriate. This court affirmed the trial court's giving the *Secondino* instruction and stated: "The testimony of an additional witness upon a significant disputed issue can hardly be categorized as cumulative." Id., 325. The alibi defense in *Ruiz* was the central element to the defendant's case.

In *State* v. *Reid,* supra, 649, the defendant was tried on murder and manslaughter charges. The defendant admitted shooting the two victims but claimed that it was in self-defense. At trial, the defendant testified that after the shooting he went to his sister's apartment and encountered his sister and Jeffrey Laforte. Laforte testified that when the defendant arrived at the apartment, he "was in a state of hysteria," and that the defendant told him that he had been attacked. Id., 661. Laforte also testified that he noticed a welt on the defendant's cheek and that the defendant's sister was present in the apartment when the defendant arrived. Id. The defendant did not call his sister as a witness.

The state requested and received, over the defendant's objection, a *Secondino* instruction on the defendant's failure to call his sister as a witness. The defendant contended, inter alia, that he would not naturally have called his sister because her testimony would have been cumulative. This court disagreed with the defendant for two reasons. First, Laforte was the only witness to testify about the defendant's emotional condition and the welt on his cheek that corroborated his claim of self-defense. We noted that additional testimony on this significant element of the defendant's case would have been helpful. Id., 662. Second, Laforte had been vigorously cross-examined and his credibility was questioned. Testimony by the sister could have bolstered Laforte's account after his credibility had been attacked. Id. Thus, we concluded that her testimony would not have been cumulative and, therefore, that the trial court did not err in giving a *Secondino* instruction.

The present case has striking similarities to both *Ruiz* and *Reid.* The defendant's attempt to distinguish these similarities is unpersuasive. In fact, in his brief, the defendant hardly distinguishes *Ruiz* at all. The defendant's brief reviews the facts of *Ruiz* and agrees with the result in that case stating that because of the proximity of the murder scene to the defendant's home, "Ruiz well *could* have entered his home and feigned sleep, without contradicting the alibi witness' testimony. It remained only for Ruiz's mother to vouch for her son's presence in the home, minutes before the alibi witness arrived and at the very time of the crime." The defendant then summarily states: "The case at bar does not present an analogous situation." To distinguish *Reid,* the defendant argues that the present case is different because in this case, two alibi witnesses, the defendant's mother and father, "firmly corroborated" the defendant's defense, and because their testimony

was not "greatly weakened" by cross-examination, additional testimony would have been cumulative.

In the present case, the defendant's mother and father were not subject to scathing cross-examination; however, their credibility cannot be accepted without question. The credibility of both witnesses is questionable because they are the parents of the defendant and, even subconsciously, their parental instincts may have led them to protect their son and offer favorable testimony on his behalf. See *State* v. *Asherman,* 193 Conn. 695, 719, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). "Implied bias may be shown by the relationship of a witness to a party . . . 3A Wigmore, Evidence (Chadbourn Rev.) § 949." Id. Also, the defendant's mother testified that of her three daughters, only one *might* have been present on the evening of January 25, 1987. She testified that she knew two of the three were *not* present and she was not sure whether the other was present because the daughters were "in and out all day." Additional testimony, therefore, would have helped to vouch for the defendant's presence in his parents' home, just as the defendant's mother's testimony in *Ruiz* would have been helpful. This is so particularly because the alibi defense was the heart of the defendant's case on the Perretta incident, just as it was in *Ruiz.* In sum, we find *Ruiz* and *Reid* to be controlling on this issue, and the defendant has not distinguished them adequately. The trial court did not err in finding that the defendant's sisters were available and naturally would be called in support of the defendant's alibi defense. Given the importance of the alibi defense to the defendant's case, the court did not err in issuing a *Secondino* instruction.[13]

---

[13] We disagree with the defendant's statement that affirmance of the *Secondino* instruction in this case will require defense counsel to call "every single witness who may have a possible thread of information to offer."

The defendant next claims that the trial court erred in granting the state's motion to reopen its case-in-chief to introduce evidence of an essential element of the crime charged: the operability of the weapon. In a related claim, the defendant contends that the trial court erred in admitting evidence that was not for purposes of proving an essential element of the offense during the state's reopened case. We disagree with both of the defendant's contentions.

The state moved to reopen its case-in-chief after it rested following the testimony of Calderwood about the condition of the gun when it was found. This motion was made before the defendant had presented a motion for acquittal and before the defendant introduced any evidence of his case.[14] The trial court stated that it did not believe that any prejudice would result from the reopening and granted the motion. The state then called Graham who testified about the test-firing and operability of the shotgun and also produced a "mug shot" from the police records.[15]

Where an alibi defense is central to the defendant's case, as in this case, and the defendant calls two immediate family members, one testifying that there were two other witnesses to the defendant's alibi and the other testifying that there might have been one other alibi witness, it would not be cumulative and would be helpful to produce the other possible alibi witnesses. This by no means requires a defendant to call "every single witness who may have a possible thread of information to offer." Calling one or both of the sisters by the defendant is not merely calling a witness "who may have a possible thread of information" but also affords the opportunity of testimony upon a significant fact in dispute.

[14] The motion was made as follows:

"Mr. Dearington: If it please the Court, the State did previously rest. Mr. Castignoli has not proceeded, made no motions or offered no evidence since then. I would move to reopen, for the reason that there is one additional element that I have to establish and as yet I have not. That is the offer-ability [sic] of the weapon, based on the robbery statute involved. And, I would respectively request an opportunity to reopen and for you Honor to release the weapon for it to be test-fired."

[15] It appears that the "mug shot" was of David Girard, the defendant's alleged accomplice. The state points out, however, that the picture was not identified to the jury as a picture of Girard.

The trial court has broad discretion in deciding whether to permit the state to reopen its case once it has rested. *State* v. *Brigandi,* 186 Conn. 521, 545, 442 A.2d 927 (1982); *State* v. *Levy,* 103 Conn. 138, 145, 130 A. 96 (1925); *State* v. *Ricker,* 90 Conn. 147, 152, 96 A. 941 (1916); A. Spinella, supra, pp. 700–701. A criminal case may be reopened to present omitted evidence or to add further testimony. *State* v. *Allen,* 205 Conn. 370, 380, 533 A.2d 559 (1987); *State* v. *Brigandi,* supra; *State* v. *Holmquist,* 173 Conn. 140, 152, 376 A.2d 1111 (1977). As with joinder, the trial court acts within its discretion in reopening unless " 'substantial prejudice will occur.' " *State* v. *Brigandi,* supra, 546; *United States* v. *Hinderman,* 625 F.2d 994, 996 (10th Cir. 1980); *United States ex rel. Carraway* v. *McMann,* 297 F. Sup. 390, 394–95 (S.D.N.Y. 1969).

In this case, the testimony of Graham regarding the operability of the shotgun did not amount to substantial prejudice. Prior to Graham's testimony, Calderwood testified that he found the shotgun that later was made a full exhibit. Calderwood indicated that he found the gun with three rounds of ammunition in it. He also stated that "all you had to do was pop the safety off and you could shoot that weapon." Calderwood, however, did not have firsthand knowledge that the weapon was operable. Graham, on the other hand, had test-fired the gun and did have firsthand knowledge that it was operable. Therefore, his testimony was not cumulative. Furthermore, this evidence was admitted before the defendant presented any evidence and even before a motion for acquittal was made by the defendant. Defense counsel had full opportunity to, and did, cross-examine the witness and thus the defendant was not prejudiced.[16]

---

[16] On this issue, the defendant's only claim of prejudice was that the testimony was cumulative.

The defendant also claims that the court erred in permitting Graham to produce a "mug shot" of a mustached man, presumably of the alleged accomplice David Girard, from the police records, to corroborate testimony of the clerk from the Melba Pharmacy. In his brief, the defendant argues that this testimony went beyond the bounds of what the state had represented in its motion to reopen and thus was inadmissible. We are not persuaded.

As we stated earlier, the trial court has broad discretion in reopening a party's case. *State* v. *Brigandi,* supra, 545. The trial court will not be reversed in the absence of a clear abuse of that discretion. Id. During the trial, the defendant did not object to the testimony of Graham in introducing the "mug shot" on the ground that it exceeded the scope of the motion to reopen. Because of this, the trial court did not abuse its broad discretion in permitting the testimony beyond the scope offered in the state's motion. Therefore, we refuse to find error in the court's permitting full examination and cross-examination of the witness, including the admission of a "mug shot" through that witness.[17]

The defendant did object to the admission of the "mug shot" on relevancy grounds. The defendant argued that there was no evidence that there was another perpetrator in the robbery and thus that the photo was irrelevant. We agree with the trial court that there was evidence of an accomplice—the clerk

---

[17] The defendant concedes that he was not able to find authority for his position but cites *State* v. *Ubaldi,* 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), as being "equivalent" to the present case. *Ubaldi,* however, should be distinguished in two important respects. First, *Ubaldi* involved prosecutorial misconduct in the presentation of evidence deliberately to undermine prior evidentiary rulings of the court. Id., 575. There is no evidence of such misconduct here. Second, in the present case, the court did not issue a limiting evidentiary ruling; see id., 564; on the scope of the reopening.

described the robber in the Melba Pharmacy as a mustached white male; Ponelli testified that he saw the defendant pick up Girard after the robbery; Dooling arrested both men together and found a shotgun shell on Girard; and Calderwood noted that Girard had a mustache when he was arrested. Thus, the trial court did not err in admitting the "mug shot" produced by Graham.

The defendant's final claim is that the trial court erred in admitting into evidence the ski mask and sneakers found by Blakesly. The defendant bases this claim on three grounds: (1) that the evidence was not relevant; (2) that even if relevant, the prejudicial effect that the evidence had on the jury outweighed its probative value; (3) that there was an insufficient chain of custody.

The defendant's brief sets out the following test for relevancy, both elements of which he maintains must be met: (1) "The items [had to have been] used in the crime, and (2) the items [had to be] in some manner linked to the Defendant." While this projection of the relevancy test may, in part, be true, it is not the well settled relevancy test that we often have cited, and we see no reason to depart from our precedent in this case.[18] The accepted relevancy test is that " ' " '[e]vidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . .' " ' " *State* v. *McClendon*, 199 Conn. 5, 8–9,

---

[18] The defendant's brief does not offer any authority for his relevancy test.

505 A.2d 685 (1986); *State* v. *Gold,* 180 Conn. 619, 645–46, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). The trial court "possesses broad discretion to resolve questions of relevancy." *State* v. *McClendon,* supra, 8; see *State* v. *Pollitt,* 205 Conn. 61, 92, 530 A.2d 155 (1987). The ski mask and the sneakers satisfy this test of relevancy.

Evidence does not have to be conclusive to be admissible and certainly this evidence is not conclusive. However, both Gellatly and Belmont testified that the ski mask found by Blakesly looked like the one worn by the robber in the Perretta robbery. Also, Belmont testified that the robber wore sneakers and that the ones in evidence "look[ed] similar" but that he really could not tell because the robber's pants were "too low" and he only saw "the fronts" of the sneakers. Thus, the ski mask and sneakers are relevant in that they are demonstrative evidence supporting the descriptions of the robber's apparel. Such evidence may tend to make the testimony of Gellatly and Belmont more credible.

The defendant also argues that even if the evidence is relevant, the prejudice caused by its admission outweighs its probative value. He claims that admission of the ski mask and sneakers created a "side issue" that distracted the jury from the central question—identification of the robber.

In *State* v. *DeMatteo,* 186 Conn. 696, 443 A.2d 915 (1982), we outlined four situations where prejudice to the defendant could outweigh the probative value of evidence. "These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having

no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." Id., 702–703; C. McCormick, Evidence (2d Ed.) § 185, pp. 439–40. The evidence in this case could arguably have been excluded only under the second classification of these four, and, in light of our prior analysis, we do not believe that it falls within its scope. The evidence of the ski mask and the sneakers did not create a side issue but may have corroborated the descriptions of the robber's clothing given by Gellatly and Belmont. Certainly, the trial court did not abuse its broad discretion in admitting this evidence under this rationale.

Finally, the defendant argues that the state failed to establish a sufficient chain of custody for the evidence and thus the judge erred in admitting it. This claim also is unpersuasive.

Given the trial court's broad discretion in this evidentiary issue; *State* v. *Johnson,* 162 Conn. 215, 233, 292 A.2d 903 (1972); again we conclude that the court acted within its authority. "The state's burden with respect to chain of custody is met by a showing that there is a 'reasonable probability' that the substance has not been changed in important respects. *State* v. *Jones,* 167 Conn. 228, 239–40, 355 A.2d 95 (1974); *State* v. *Johnson,* [supra, 232]. 'The court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it . . . . ' *State* v. *Piskorski,* 177 Conn. 677, 697, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)." *State* v. *Nieves,* 186 Conn. 26, 31 n.4, 438 A.2d 1183 (1982); B. Holden & J. Daly, Connecticut Evidence (1988) § 91c. No evidence was presented indicating that the evidence in this case was tampered with. The nature of the mask and sneakers does not lend itself to the likelihood of tampering. The evidence was offered in this case to show that it was found in the area of the

crime and that it was like the mask and sneakers observed by Belmont and Gellatly (mask only). Blakesly testified that the evidence as he observed it in court appeared the same as it did when he found it on the side of the road. From this, we conclude that the judge did not err in admitting this evidence. The trial court reasonably could have concluded that the evidence was not tampered with. Therefore, the trial court did not err in admitting the ski mask and sneakers introduced at trial and identified by Gellatly (mask only), Belmont and Blakesly.

There is no error.

In this opinion the other justices concurred.