STATE OF CONNECTICUT *v.* WILLIAM H. DORISS
(AC 23941)

Foti, Dranginis and Flynn, Js.

Argued June 3—officially released August 17, 2004

*James M. Fox*, special public defender, for the appellant (defendant).

*Brian R. Weber*, certified legal intern, with whom were *Marjorie Allen Dauster*, senior assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, and *Maura K. Coyne*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, William H. Doriss, appeals from the judgments of conviction, rendered after a jury trial, of two counts of failure to restrain an animal from doing injury to another animal in violation of General

Statutes § 53-247 (a).[1] The trial court sentenced the defendant to two years of incarceration, execution suspended, and ordered him to pay restitution in the amount of $2855. On appeal, the defendant claims that (1) the state engaged in improper closing argument that deprived him of a fair trial and (2) the court abused its discretion by requiring him to pay restitution. We affirm the judgments of the trial court.

The following facts, which the jury reasonably could have found, are pertinent to our review. Two separate informations were consolidated for trial. The first information concerned an occurrence that took place while the defendant was walking his pet rottweiler on Daggett Street in New Haven. The defendant held his dog's collar and directed the dog's face in the direction of a Chihuahua. He then released his rottweiler, which proceeded to attack the Chihuahua by biting its neck and swinging it from side to side, puncturing its skin. The Chihuahua was dead by the time the police arrived at the scene. In his defense, the defendant testified that his rottweiler jumped out of his van before he could stop it and attacked the Chihuahua.

In a separate incident, Denise Bryant saw the defendant holding her pit bull's front paws while the defendant's rottweiler and his other mixed breed dog bit her

---

[1] The information in the first case charged the defendant with one count of criminal trespass in the third degree in violation of General Statutes § 53a-109, one count of neglecting to restrain an animal from doing injury to another animal in violation of General Statutes § 53-247 (a) and one count of malicious and intentional maiming, torturing or wounding of an animal in violation of § 53-247 (b). After being amended, the information in the second case charged the defendant with two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1), one count of neglecting to restrain an animal from doing injury to another animal in violation of § 53-247 (a) and one count of malicious and intentional maiming, torturing or wounding of an animal in violation of § 53-247 (b). The defendant was found not guilty of all charges except for the two counts of neglecting to restrain an animal from doing injury to another animal.

dog on the throat and thigh causing deep lacerations on her dog's body, which later became infected. The defendant defended against these allegations by testifying that one of his two dogs broke its choke chain and that he attempted to catch his dog. The defendant further testified that he found his dog in front of 10 Daggett Street in an altercation with Bryant's pit bull, which had his dog's head in its mouth, and that he attempted to pry the two dogs apart.

## I

We first address the defendant's claim that the state engaged in improper closing argument that deprived him of a fair trial. Defense counsel, in closing argument, sought to persuade the jury that the defendant was not criminally responsible for either dogfight, that neighbors unfairly blamed the defendant, that the state's witnesses were not in a proximity close enough to either dogfight to see the events accurately and that passage of time had dulled the witnesses' memories of the events.

In rebuttal, the prosecutor at one point stated that the defendant "didn't count on the credibility of the state's witnesses." As to Bryant, the prosecutor expressed the opinion that she was a "very credible witness." We agree with the defendant's contention that these statements were improper.

The Rules of Professional Conduct are clear and unequivocal. "A lawyer shall not . . . (5) . . . state a personal opinion as to . . . the credibility of a witness . . . ." Rules of Professional Conduct 3.4. This satisfies the first prong of our review standard of misconduct claims, namely, that the comments in fact were improper. See *State* v. *McKiernan*, 78 Conn. App. 182, 195, 826 A.2d 1210, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003). We next turn to the second stage of inquiry, which requires us to determine whether, as a result of the misconduct in the context of the entire

trial, the defendant was deprived of a fair trial. See id. This involves a six step analysis of the misconduct first enunciated by our Supreme Court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

The first step centers on whether the conduct was somehow invited by the defense. Id. We find nothing in the record before us to warrant such a conclusion. In final argument to the jury, defense counsel could and did, as part of his proper adversarial role, discuss those parts of the evidence from which the jury might infer that there was reasonable doubt as to the defendant's guilt. He did not express personal opinions about witness credibility. Nothing that he said invited or justified the state's violation of rule 3.4.

The severity of the misconduct is a second factor to be considered. Id. There, our Supreme Court has set a high bar. See *State* v. *Thompson*, 266 Conn. 440, 479–80, 832 A.2d 626 (2003). In *Thompson*, our Supreme Court reviewed and found improper the prosecutor's repeatedly calling the defendant a "killer"; id., 472; calling the testimony of the defendant's two principal witnesses "reprehensible," saying that they were "lying"; id., 465; and lacked both "moral fortitude" and a "conscience," lived in a "twisted world," were not "stand-up enough guy[s]," let misguided loyalty to a friend influence their testimony and that by it, they had "reserved a place in hell for themselves"; (internal quotation marks omitted) id., 461; were truthful in their earlier, recanted pretrial statements and that to believe their trial testimony, jurors had to believe that the state's witnesses had lied. Id., 466–69. The *Thompson* court also found that the prosecutor improperly importuned the jury to give the victim's family justice by convicting the defendant; id., 473–74; and, finally, that he improperly urged the jury to use impeachment evidence against a third defense witness substantively. Id., 476–77. The court found that this misconduct "was not, for the most part, severe."

Id., 479. By the *Thompson* standard, which constrains our review, we conclude that the defendant has not satisfied the severity prong.

We next turn to the frequency prong. See *State* v. *Williams*, supra, 204 Conn. 540. Although the defendant cites several instances of possible misconduct, they were not particularly frequent.

We also are required to examine the centrality of the misconduct to the issues in the case. Id. The issues to be determined by the jury depended on the weighing of the credibility of several of the state's witnesses who testified in a manner consistent with the defendant's having let the dogs loose and encouraging their attacks on the other animals, as opposed to the defendant's version of events that depicted him as a person on the scene trying to recapture his errant canine and thereby stop the fighting dogs. Because the jury was required to choose between these two versions of events, the credibility of each side's witnesses was central to the jury's determination of guilt.

We next assess the strength of the curative measures adopted by the court. Id. Although the defendant had not yet objected, the court commendably intervened and took strong curative measures immediately after the state had concluded its rebuttal. The court gave the following curative instruction to the jury: "I want to state this, ladies and gentlemen of the jury. [N]ow, the state cannot vouch for the credibility of any witnesses, any of their witnesses, or any witnesses at all that testified in this trial. Any reference remarks the state made in closing argument regarding its opinion about the credibility of any witness [were] . . . improper and you are to disregard them. You, as the fact finders, are the sole judges of the credibility. Again, disregard any comments by the state about the credibility of any of its witnesses or any other witnesses on this case." Without

evidence to the contrary, we presume that the jury has followed the corrective instructions given by the court. *State* v. *James G.*, 268 Conn. 382, 420, 844 A.2d 810 (2004). The court, "in keeping with its responsibility as a minister of justice," gave an effective curative instruction. See *State* v. *Bunleut*, 82 Conn. App. 648, 655, 846 A.2d 912, cert. denied, 270 Conn. 904, 853 A.2d 522 (2004). In addition, after giving this instruction, the court asked the defendant if he had any objections to put on the record. The defendant responded that he had an objection to the prosecutor's comments regarding witness credibility in its rebuttal, but stated that "Your Honor, covered it."

*Williams* also requires us to consider the strength of the state's case. *State* v. *Williams*, supra, 204 Conn. 540. There was strong evidence from the witnesses that the defendant loosed his dogs and encouraged them to attack the other animals. Judging the effect of the improper remarks of the prosecutor in the context of the entire trial, including the court's strong curative instruction, we are not convinced that they deprived the defendant of his right to a fair trial. Furthermore, we note that the jury found the defendant not guilty on six separate charges found in the two informations, which indicates that the jury's deliberations were not overborne by the prosecutor's improper opinions as to the credibility of witnesses.

II

We next turn to the defendant's second reason for appeal, namely, that the court abused its discretion in ordering him to pay $360 to Bryant[2] and $2495 to the New Haven police animal shelter within fifteen months. We employ an abuse of discretion standard in reviewing

[2] We note that the attachment to the judgment file mistakenly states that this sum was to be paid to Mae Robinson. The transcript reveals that the court actually ordered the restitution to be paid to Bryant.

such claims. See *State* v. *Thorp*, 57 Conn. App. 112, 116, 747 A.2d 537, cert. denied, 253 Conn. 913, 754 A.2d 162 (2000).

The sentencing court has broad discretion in imposing sentence. *State* v. *Huey*, 199 Conn. 121, 126, 505 A.2d 1242 (1986). General Statutes § 53a-30 (a) provides in relevant part that "[w]hen imposing sentence of probation or conditional discharge, the court may, as a condition of the sentence, order that the defendant . . . (4) make restitution of the fruits of the defendant's offense or make restitution, in an amount the defendant can afford to pay or provide in a suitable manner, for the loss or damage caused thereby and the court may fix the amount thereof and the manner of performance . . . ."

The defendant concedes that § 53a-30 (a) gives the court the general authority to require restitution as a condition of a probation sentence. However, he contends that the expense caused to Bryant and the city do not constitute "fruits of the defendant's offense" for which a court can require restitution.

In our interpretation of this statute, our review is plenary. See *State* v. *Swain*, 245 Conn. 442, 451, 718 A.2d 1 (1998). The statute does not define "fruits." "[I]n the absence of . . . statutory . . . guidance . . . [the court] may appropriately look to the meaning of the . . . [word] as commonly expressed in the law and in dictionaries." (Internal quotation marks omitted.) *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 178, 713 A.2d 1269 (1998). "Fruit" can be defined as "the outcome, consequence or result of some action." The Standard Encyclopedic Dictionary (1966). This common use of the term is often so employed to describe the product or end product of some action or omission. Significantly, Roget's International Thesaurus (4th Ed. 1977) lists "fruit" as a synonym for "product." We therefore con-

clude that the veterinary bills of Bryant and impoundment bills incurred by the city as consequences of the defendant's crimes met the statutory requirement of fruits for which the court could order restitution.

The defendant also claims that the sentencing court must base its decision on reliable factors, thus assuring him due process in the imposition of his sentence. The defendant contends that the court failed to consider his ability to pay restitution. The court had before it reliable information derived from the defendant's own allocution in which he indicated he had supported himself as an antiques dealer, carpenter, construction worker and, several years earlier, as a chiropractor in Illinois. He attended the University of Chicago and graduated from Lehigh University. Although the defendant was provided the services of a public defender, the court certainly was justified in concluding that he had the means of earning income during the fifteen-month period set for restitution.

The defendant also claims that he was convicted only of neglecting to restrain or cage an animal in violation of § 53-247 and acquitted of any intentional misconduct. We conclude that this argument misses the point. It was the defendant's failure to restrain his dogs that caused injury to, and in one case the death of, other animals. It was well within the court's discretion to impose a condition of restitution to one of the animal's owners, who incurred veterinary bills, and to the New Haven police department animal shelter, which bore the expense of confining the defendant's impounded rottweiler.

The judgment is affirmed.

In this opinion the other judges concurred.