STATE OF CONNECTICUT *v.* GEORGE BINNETTE
(AC 24107)

Lavery, C. J., and Flynn and Bishop, Js.

---

Argued October 13—officially released December 21, 2004

*Lisa Samuelson*, assistant public defender, with whom was *Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Sarah Hanna*, special deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *David R. Shannon*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, George Binnette, appeals from the judgment of conviction, rendered after a jury trial, of criminal violation of a protective order under General Statutes § 53a-223. On appeal, the defendant claims that (1) the evidence was insufficient to support a conviction for criminal violation of a protective order, (2) the trial court denied him the right to due process by improperly instructing the jury, (3) the state denied him the rights to due process and a fair trial by engaging in prosecutorial misconduct and (4) the court denied him the right to effective assistance of counsel by failing to conduct an adequate inquiry into counsel's representation. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim were involved in a romantic relationship that became violent. On April 17, 2002, the victim telephoned the police following a violent episode in which she sustained injuries at the hands of the defendant. Aware that a warrant for his arrest had been issued on the basis of the victim's complaint,

the defendant turned himself in to the police. On May 20, 2002, the court, *White, J.*, issued, inter alia, a protective order that prevented the defendant from imposing any restraint, and from threatening, harassing, assaulting, molesting or sexually assaulting the victim or entering her home. The order did not mandate that the defendant refrain from contacting the victim, and they did continue to be involved romantically after its issuance.

On May 28, 2002, the defendant and the victim spent the night together at the home of the defendant's sister. The next day, after the defendant and the victim fought, the victim returned to her home, which she shared with another male friend, Richard Metivier and others. At approximately 10 p.m., the defendant came to the victim's home, and Metivier let him in. After attempts to get the victim to accompany him failed, the defendant began throwing things in the house and broke an entertainment center and a television. He then left, but repeatedly telephoned the victim.

A few hours later, at approximately midnight, the defendant returned to the home of the victim. The defendant apparently gained entry through a basement window. While the defendant was attempting to talk with the victim, Metivier retreated to an outside porch to telephone the police. The defendant soon followed and assaulted Metivier. The defendant left the premises after the victim hit him with a baseball bat, but he continued to telephone her home. During one of the telephone calls, the police took the telephone from Metivier, but the defendant immediately hung up. Between 4 p.m. on May 29, 2002, and 4:30 a.m. on May 30, 2002, the defendant telephoned the victim's home fifty-six times.

On the night of May 31 and into June 1, 2002, the defendant telephoned the home of the victim numerous times and either spoke with Metivier or activated the answering machine. During one of these calls, in the

early morning of June 1, 2002, the defendant informed Metivier that he was on his way over. The victim telephoned 911. Shortly thereafter, the victim saw the defendant on the street outside of her home and was very scared. Metivier testified that the defendant threw a beer bottle at the door of the victim's house. Metivier and one of his friends got into a fistfight with the defendant several houses away from the victim's home, and the defendant lost two of his front teeth in the fight. After a brief chase, the police apprehended the defendant near the victim's house and charged him with criminal violation of a protective order and interfering with a police officer. The police then took photographs of the crime scene, including photographs of the broken beer bottle on the front steps of the victim's home.

On March 14, 2003, the jury found the defendant guilty of, inter alia, violating a protective order on June 1, 2002.[1] This appeal followed.

## I

The defendant first claims that the evidence was insufficient to support a conviction of criminal violation of a protective order on the basis of his conduct on June 1, 2002.[2] He argues that "[t]he state failed to prove . . . that the defendant intended to engage in conduct that would violate the order, specifically to harass [the victim]" on the specific date of June 1, 2002. The defendant contends that his purpose for going to the victim's street in the early morning of June 1, 2002, was to

---

[1] The defendant also was charged with and convicted of interfering with an officer, stemming from his actions on June 1, 2002, assault in the third degree, stemming from his actions on April 17, 2002, and another charge of violation of a protective order, stemming from his actions on May 29, 2002. The jury found the defendant not guilty on a charge of burglary in the first degree, also stemming from his actions on May 29, 2002. Those additional charges and convictions are not subjects of this appeal.

[2] The defendant preserved his claim when he filed a motion for a judgment of acquittal of that charge on the ground of insufficient evidence.

engage in a confrontation with Metivier and not to see or harass the victim. We conclude that the state presented evidence sufficient for the jury to conclude that the defendant violated the protective order on June 1, 2002, and we reject the defendant's claims concerning the intent necessary to prove a violation of the protective order statute.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defen-

dant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Citation omitted; internal quotation marks omitted.) *State* v. *Charles*, 78 Conn. App. 125, 139–40, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003).

The court issued a protective order against the defendant in favor of the victim on May 20, 2002, prohibiting the defendant from, among other things, harassing the victim. As we have explained previously, "a violation of a protective order does not incorporate the specific intent to harass. . . . All that is necessary is a general intent that one intend to perform the activities that constitute the violation." (Citations omitted.) Id., 140. The defendant's argument, although acknowledging that criminal violation of a protective order is a general intent crime, invites us to impose a specific intent gloss that the statute does not require. We reject the invitation.

After a tumultuous few days, the defendant, in the early morning of June 1, 2002, repeatedly telephoned the home of the victim and finally stated that he was coming over. Although he contends that his purpose for going to the victim's street was to confront Metivier and not the victim, the victim did see him outside of her home and was frightened. The defendant places much emphasis on the apparently inconsistent testimony of Metivier concerning whether he saw the defendant throw a beer bottle at the victim's home on June 1, 2002.[3] The jury, however, was free to accept a part

---

[3] Metivier testified on direct examination that the defendant threw the bottle, but then on cross-examination testified that he did not remember the defendant coming to the house on June 1, 2002, and that he "honestly" could not say whether he saw the defendant in front of the house on that date.

of Metivier's testimony and to reject another part of it. On direct examination, Metivier specifically testified that the defendant threw the bottle. Additionally, the police saw the broken bottle on the front steps of the victim's home and, in fact, photographed it. Furthermore, the jury certainly could have concluded that the defendant's intentional conduct of repeatedly telephoning the victim's home, announcing that he was coming over and then arriving at the victim's street, even with the intention of confronting Metivier, had the effect of harassing the victim.

On the basis of our review of the record, we conclude that there was sufficient evidence before the jury from which it could conclude that the defendant had violated the protective order on June 1, 2002.

## II

The defendant next claims that the court denied him the right to due process by improperly instructing the jury and, essentially, directing a verdict.[4] The defendant focuses on the following language in the court's instruction: "In this case, there is evidence that a protective order allegedly issued against the defendant and in favor of [the victim] and prohibited him from engaging in the conduct just mentioned. There is no evidence that on . . . June 1st, 2002 that the defendant imposed any restraint on the person or liberty of [the victim], threatened, assaulted, molested, or sexually assaulted her. Therefore, I instruct you that you may not consider these prohibited acts in reaching your verdict. . . . In addition, there is evidence that on—on or about June 1st, 2002 the defendant intentionally harassed [the vic-

[4] The defendant did not preserve his claim and seeks review pursuant to State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the record is adequate for review and the claim is of constitutional magnitude, we agree that the defendant is entitled to Golding review.

tim] and that the protective order was in effect both on May 29 and June 1, 2002.

* * *

"Again, the types of forbidden acts for which there is evidence in this case include harassment and entering the dwelling occupied by the victim."

The defendant claims that the trial court's instruction that there was evidence of intentional harassment of the victim relieved the state of its burden of proof beyond a reasonable doubt. The defendant, however, does not explain or analyze how this part of the court's instruction diluted the state's burden of proof. In any case, we do not agree with his claim of error and conclude that the claim fails under *Golding*'s third prong, which requires that a constitutional violation clearly exist that clearly deprived the defendant of a fair trial.

When determining whether a jury charge diluted the state's burden of proof, we do not look at the charge in isolation, but examine it within the context of the entire charge. *State* v. *Bailey*, 82 Conn. App. 1, 10, 842 A.2d 590, cert. denied, 269 Conn. 913, 852 A.2d 744 (2004). "[A] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [W]e see if [the jury instructions] gave the jury a reasonably clear comprehension of the issues presented for their determination . . . and were suited to guide the jury in the determination of those issues." (Internal quotation marks omitted.) *State* v. *Coleman*, 83 Conn. App. 672, 689–90, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004).

In this case, the court clearly explained to the jury the elements of the crime of violation of a protective order. Next, it addressed the state's burden of proof and repeatedly instructed the jury that the state had the burden of proving each and every element beyond a reasonable doubt. The court then explained how the evidence in this case related to the elements of the charged crimes, and it explained that the state had not presented evidence of certain things and that the jury, therefore, was not to consider those things. Finally, the court restated the elements of the crime of violation of a protective order and reminded the jury that to find the defendant guilty, it needed to find that the state proved each element beyond a reasonable doubt.

Viewing the instructions as a whole, we conclude that it was not reasonably possible that the court misled the jury as to the state's burden of proof. There being no clear constitutional violation that deprived the defendant of a fair trial, we conclude that this claim fails under the third prong of *Golding.*

### III

The defendant's third claim on appeal is that the state denied him his rights to due process and a fair trial by engaging in prosecutorial misconduct. Specifically, the defendant claims that during its rebuttal argument to the jury, the state, without invitation by the defense, improperly vouched for both Metivier and the victim.[5]

---

[5] The defendant initially requested review pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40. See footnote 4. In his reply brief, he acknowledges, however, that our Supreme Court has "clarified our due process analysis in cases involving incidents of prosecutorial misconduct to which no objection has been raised at trial. [It] explained that, in such cases, it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . *Golding* . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Ancona,* 270 Conn. 568, 591, 854 A.2d 718 (2004).

"The object of inquiry before a reviewing court in [due process] claims involving prosecutorial misconduct . . . is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves.

The state contends that the challenged remarks were proper comments on the evidence and the reasonable inferences to be drawn therefrom. We agree with the state that the remarks were not improper.

The defendant specifically complains that during rebuttal, the prosecutor argued, in part: "If [Metivier and the victim] were making these things up and they were just lying to get the defendant in trouble, [w]hy [wouldn't] they say on June 1—why wouldn't they say he came right up on the front porch or he came into the house on that day too. Why wouldn't they say— why couldn't [the victim] come in and testify [that she] did pick up the phone and . . . [the defendant] was screaming at [her], threatening to kill [her]? She didn't. She said he was just on the street. . . . So, consider that when you compare the credibility of [Metivier and the victim versus] the defendant's. She could have said anything but she didn't. She said, 'Yeah, he's on the street. I didn't talk to him directly but I did feel harassed.' "

The defendant also complains that the prosecutor then stated: "Metivier and [the victim] may not be—it might be the lifestyle you don't approve of—we don't really know—the only thing we know from [the defendant] is that they use drugs according to [the defendant]. According to him—if you believe him. And again, you assess his credibility based on everything you've heard. But even if you get the feeling that you don't really approve [of] their lifestyle or maybe they're not the

Application of the *Williams* factors [see *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] provides for such an analysis, and the specific *Golding* test, therefore, is superfluous. In light of these observations, [our Supreme Court has] conclud[ed] that, following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the *Williams* factors to the entire trial." (Internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 592–93.

kind of people you're going to invite over your house for Thanksgiving dinner, does that mean they're not capable of telling the truth? Do you believe them versus [the defendant's] story? That's really the question you have to ask. And then when you decide whether you're going to believe them, look at everything the police say. Does it corroborate what they have to say? And then ask yourself this: Did [Metivier] and [the victim] get caught in any major inconsistencies? Did the alibi witnesses? That's for you to judge. How about [the defendant]? Did his story change? Evolve? You decide."

The first prong of our review standard for claims of prosecutorial misconduct requires that we make a determination as to whether the prosecutor's comments in fact were improper. *State* v. *Doriss*, 84 Conn. App. 542, 545, 854 A.2d 48, cert. denied, 271 Conn. 922, 859 A.2d 581 (2004). "The Rules of Professional Conduct are clear and unequivocal. 'A lawyer shall not . . . (5) . . . state a personal opinion as to . . . the credibility of a witness . . . .' Rules of Professional Conduct 3.4." *State* v. *Doriss*, supra, 545. As an advocate, however, the prosecutor permissibly may "employ forceful arguments based upon the facts in evidence and the reasonable inferences drawn from such facts." (Internal quotation marks omitted.) *State* v. *Tate*, 85 Conn. App. 365, 374, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004). Only if we conclude that the statements actually were improper do we move on to the second stage of our inquiry, "which requires us to determine whether, as a result of the misconduct in the context of the entire trial, the defendant was deprived of a fair trial." *State* v. *Doriss*, supra, 545–46.

In the present case, the prosecutor's use of rhetorical questions and argument referring to facts in evidence and inferences that might be drawn therefrom and asking the jury to decide who was telling the truth was not improper. The prosecutor did not state that he believed one witness over the other or that the defen-

dant was a liar. Rather, he asked the jury to decide on the credibility of the witnesses by weighing their testimony in the light of the surrounding circumstances, including their motivations. This is at the heart of a jury's proper function.

After reviewing the challenged portion of the prosecutor's rebuttal argument, we conclude that his remarks were not an improper opinion or voucher for the credibility, or lack thereof, of the witnesses. We conclude that the defendant's third claim is without merit.

## IV

The defendant's fourth and final claim on appeal is that the court denied him the right to effective assistance of counsel. Specifically, the defendant argues: "The trial court denied the defendant his right to effective assistance of counsel when it failed to explore or make an adequate inquiry into his complaints about his attorney." He further argues: "Alternatively, the trial court abused its discretion in failing to question the defendant further once he provided the court with substantial reasons for his dissatisfaction with his attorney."[6] Although the defendant frames this claim as a denial of his right to effective assistance of counsel, he did not request alternate counsel, nor does he argue that he was entitled to alternate counsel. Rather, he argues that the court should have inquired further on the merits of his complaints regarding his attorney, and that the court's alleged failure to so inquire entitles him to a new trial. We conclude that this claim is without merit.

"Where a defendant voices a seemingly substantial complaint about counsel, the court should inquire into the reasons for dissatisfaction." (Internal quotation

---

[6] As a preliminary matter, we observe that the defendant's claim concerns "complaints" that he made to two different trial court judges at different phases of the proceedings.

marks omitted.) *State* v. *Gonzalez*, 205 Conn. 673, 685, 535 A.2d 345 (1987). When the defendant's concerns fall short of a "seemingly substantial complaint," however, our Supreme Court has instructed that the trial court does not act improperly in failing to inquire into the reasons underlying the defendant's dissatisfaction with his attorney.

In this case, the defendant raises five specific instances where he claims the court should have inquired further about counsel's representation. First, during a pretrial proceeding on October 30, 2002, before the court, *Carroll, J.*, the defendant stated that his new counsel[7] was "overworked" and did not have time for him. After hearing this "complaint," the court briefly discussed the matter with the defendant, and the defendant acknowledged to the court that counsel knew what he was doing. The court then instructed the defendant to later discuss the matter further with counsel.

The next indication that the defendant might have had a "complaint" about his counsel presented itself during the trial. While his counsel was cross-examining a witness, the defendant was speaking loudly. The court instructed the defendant to keep his voice down because he was distracting the court and the jury. The defendant then addressed the court, stating that he was concerned because certain things were not being brought out in the testimony. The court instructed the defendant that it was not limiting his ability to confer with his counsel, but, rather, it was simply instructing him to keep his voice down. No further comment was attempted by the defendant.

The defendant next recounts a brief exchange that occurred on the second day of trial as he was about to take the witness stand against the advice of counsel.

---

[7] The defendant had obtained a new attorney during a July 10, 2002 pretrial proceeding because he did not like his prior court-appointed counsel.

The court asked the defendant if he understood that he was acting against the advice of counsel, and the defendant answered: "Well, if I'm going to go down for anything, I'm going to go down on my own without—" The court stopped the defendant and asked if that meant that he understood. The defendant answered: "Yes, sir." The defendant then asked to have his foot shackles removed so that the jury would not view them when he walked to the witness stand, and the court complied. The defendant also asked for a moment to confer with his attorney before he testified, and the court again complied with his request.

The defendant also cites his inquiry to the court regarding an instruction to the jury on a lesser included offense of burglary in the third degree. He states that this exchange also demonstrates an instance where the court should have inquired further as to why counsel had not explained the matter to the defendant. Contrary to the defendant's assertion, the court did listen to the defendant, and it explained that it appeared to be a matter of trial strategy.[8] The defendant said "okay" and thanked the court.

The final "complaint" cited by the defendant, where he asserts that the court should have inquired further, occurred after the jury verdict was read. The specific colloquy was as follows:

"The Court: . . . And, do you want to go to sentencing, [counsel]?

"The Defendant: That's fine, can I address you before you—

"The Court: You want to be sentenced today?

---

[8] It also is interesting to note that counsel's strategy seemed to have worked for the defendant. The court did not charge the jury on the lesser included offense of burglary in the third degree, and the defendant, in fact, was acquitted of the charge of burglary in the first degree.

"The Defendant: Yeah, that's fine.

"The Court: Okay. Well, let's pass—let's pass this until 2 o'clock. We'll sentence him at 2 o'clock.

"The Defendant: Okay.

"[Counsel]: Thank you, Your Honor."

The court then recessed until 2 p.m. When court resumed, the defendant was given an opportunity to address the court before sentencing, and he did, in fact, address the court, explaining that his mother was ill, that he was "not all that bad of a guy" and that drugs and alcohol had played a big role in his problems. He then asked the court to let his sentence run concurrently rather than consecutively. At no point during this statement did the court limit him.

The defendant claims that these specific "complaints" about counsel obligated the court to inquire further and that the court's failure to so inquire mandates a reversal of the judgment because the court abused its discretion and deprived him of a fair trial. We simply do not agree that any of these instances, or that the instances taken as a whole, form a substantial complaint that obligated the court to conduct further inquiry. Where complaints fall short of a "seemingly substantial complaint," our Supreme Court has instructed that the trial court does not act improperly in failing to inquire into the reasons underlying the defendant's possible dissatisfaction with his attorney. See *State* v. *Gonzalez*, supra, 205 Conn. 685. Accordingly, we conclude that this claim is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.