## STATE OF CONNECTICUT *v.* MICHAEL FAUCI
(AC 24446)

Flynn, Bishop and DiPentima, Js.

Argued November 15, 2004—officially released February 1, 2005

*Robert S. Bello*, with whom, on the brief, were *Patrick D. McCabe, Lawrence M. Lapine* and *Thomas M. Cassone*, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Maureen V. Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Michael Fauci, appeals from the judgments of conviction, rendered after a consolidated trial by jury, of three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and three counts of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4). He was sentenced to a total effective term of fifteen years incarceration with five years of special parole. On appeal, the defendant claims that he was deprived of a fair trial because (1) the court abused its discretion in granting the state's motion for joinder, (2) the court improperly instructed the jury to consider the evidence cumulatively and (3) the prosecutor engaged in misconduct. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On the evening of May 28, 2001, the defendant and his friend, Ricky Saymon, robbed a McDonald's restaurant in Orange. The defendant's former girlfriend, Laurie Lasko, drove the getaway car. Lasko parked her red Buick Skylark in an abandoned parking lot near the McDonald's, and she waited in the car while the

defendant and Saymon, wearing black clothing, masks and gloves and carrying a duffle bag, went to rob the restaurant. The defendant carried a gun, and Saymon carried a hammer. At approximately 11:45 p.m., the defendant and Saymon gained access to the closed restaurant by throwing a rock through a glass door. The restaurant manager, Inez Padilla, and one employee, Marlene Flores, were inside the restaurant. The defendant pointed the gun at Padilla and ordered her to give him the money that she was holding in her hand, as she prepared to make the nightly deposit. The defendant took the money and then locked both Padilla and Flores in the stockroom. Soon, he demanded that Padilla give him all of her keys so that he could unlock the drop safe under the front counter. Padilla gave him the keys from underneath the stockroom door, but told him that she did not have the key to the drop safe. Padilla and Flores listened as they heard the defendant and Saymon ransack the restaurant for fifteen or twenty minutes. Once things quieted down, they pushed out some ceiling tiles in the stockroom, crawled through the opening and escaped. They found that the restaurant had been ransacked, the register drawers had been pried open and the drop safe had been stolen. They telephoned the police.

On August 10, 2001, the defendant suggested to Samuel Parisi that they rob a Taco Bell restaurant in Norwalk to obtain money to post bail for Saymon.[1] The defendant's younger brother, Adam Fauci, drove the getaway car and took the defendant and Parisi to the back of the Taco Bell parking lot. After dropping them off, Adam Fauci drove across the street to a gasoline station to wait. Both Parisi and the defendant, wearing black clothing, masks, gloves and hats and carrying firearms, waited near a dumpster for the customers to

[1] Apparently, Saymon had been arrested and was being held on unrelated charges.

leave the Taco Bell. The defendant carried a loaded firearm, and Parisi carried two unloaded firearms. Parisi picked up a rock and, once the customers were gone, threw it through the glass door, and he and the defendant entered the Taco Bell with their weapons drawn. The defendant pointed his firearm at the manager, William Morales, while Parisi kept his weapons pointed at the four employees. The defendant asked Morales where the money was kept, and Morales said that it was in the office. The defendant then walked Morales to the office to get the deposit bag. The defendant next ordered Morales to open the safe at the front counter. Morales attempted to open the safe but explained that it was deadlocked and could not be opened until morning. The defendant did not accept this and ordered Morales to try again. When the defendant ordered Morales to try a third time, Morales explained that an alarm would sound and the police would come if he tried again. The defendant then ordered the cashier at the drive through window to give him the money from that cash register, which the cashier did, and the defendant and Parisi left the Taco Bell.

On September 5, 2001, the defendant borrowed Lasko's car, and he, Parisi and Saymon, who was then out of jail, planned to rob a McDonald's restaurant in Norwalk. The men gathered their gloves, masks, hats and hooded sweatshirts for the robbery. They also took their firearms. Although they had planned to gain access to the McDonald's by throwing a rock through a glass door, the door was unlocked, giving them easy access. Saymon grabbed the manager, Daisy Ashman, and ordered her to open the safe. The defendant stood over another employee, Blanca Vasquez, ensuring that she did not move. After Ashman opened the safe, Parisi emptied it. Saymon then asked Ashman where additional money was located, and Ashman stated that she did not know. The men then grabbed Vasquez's purse,

which contained $500, and they ran out of the McDonald's.

The defendant was charged with and convicted of three counts of robbery in the first degree and three counts of conspiracy to commit robbery in the first degree. This appeal followed.

I

The defendant first claims that the court abused its discretion in granting the state's motion for joinder. Specifically, the defendant argues that the evidence of each crime would not have been cross admissible had the cases been tried separately, that the jury was confused by the manner in which the state presented the evidence and that the robbery at the McDonald's in Orange was particularly brutal. All of this, the defendant argues, resulted in clear prejudice against him and deprived him of a fair trial. The state argues that the evidence was not only cross admissible but that joinder was also proper under the factors stated in *State* v. *Boscarino*, 204 Conn. 714, 722–23, 529 A.2d 1260 (1987). We agree with the state.

In its motion for joinder before trial, the state argued that the robbery and conspiracy charges, although technically not signature crimes, were so similar that they clearly demonstrated a common scheme, plan or design such that the evidence of each crime would be cross admissible if the cases were tried separately. The defendant objected, claiming that the robberies and conspiracies were so similar that allowing the cases to be joined would pose a risk of confusing the jury. He also argued, however, that the crimes were not so similar that evidence pertaining to each crime would be cross admissible under a signature crime theory. The court, in granting the motion for joinder, reasoned that although the crimes did not amount to signature crimes, they did contain a sufficient degree of similarity. The court

also weighed the *Boscarino* factors and concluded that consolidation was proper in this case.

General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 41-19. "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 94–95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

"Because of its prejudicial impact, evidence of prior acts of misconduct is inadmissible merely to show a defendant's bad character or tendency to commit criminal acts. . . . An exception to the rule prohibiting the substantive admission of a defendant's prior criminal offenses in the trial of another case is when the collateral crime tends directly to prove the commission of the principal crime, or the existence of any element of the principal crime . . . . Consistent with this rule, the state may introduce evidence of other crimes to establish a defendant's intent, identity, malice, motive or system of criminal activity. . . .

"Where evidence of one incident can be admitted at the trial of [another incident], separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Citations omitted;

internal quotation marks omitted.) *State* v. *Marsala*, 43 Conn. App. 527, 532–33, 684 A.2d 1199 (1996), cert. denied, 239 Conn. 957, 688 A.2d 329 (1997).

We agree with the trial court that joinder in this case was proper because evidence relating to each crime would have been admissible in each separate trial to prove a common plan or scheme. See *State* v. *Greene*, 209 Conn. 458, 464–65, 551 A.2d 1231 (1988). "To be relevant on the issue of identity or common scheme, the other crime charged must be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . The similarities connecting the crimes need not be so unique as to constitute signature crimes. . . . Rather, the features may be of substantial but lesser distinctiveness which, if considered separately, would be insufficient to raise an inference, but when taken together yield a distinctive combination." (Citations omitted; internal quotation marks omitted.) *State* v. *Marsala*, supra, 43 Conn. App. 533–34.

Here, the robberies were similar in many ways: They all occurred during a relatively short period of time, less than a four month period; all occurred at fast food restaurants in nearby towns; all of the restaurants were closed; a few employees were inside; the assailants entered or planned to enter the establishments by throwing a rock through a glass door; firearms were used; the restaurant manager was ordered at gunpoint to open the safe; and the assailants wore black clothing, masks and gloves. We conclude that the trial court did not abuse its discretion when it determined that these similarities sufficed to demonstrate a common plan or scheme, and, therefore, it properly granted the state's motion for joinder.

Furthermore, employing the *Boscarino* factors; see *State* v. *Boscarino*, supra, 204 Conn. 722–23; as did the

trial court, we conclude that even if the similarities of these crimes were not sufficient to allow for cross admissibility on a theory of common plan or scheme, the court did not abuse its discretion in granting the state's motion for joinder of the charges.

Our Supreme Court, in *Boscarino*, "set forth the standards that a trial court must employ in deciding a joinder issue. . . . The decision of whether to order severance of cases joined for trial is within the discretion of the trial court, and the exercise of that discretion [may] not be disturbed unless it has been manifestly abused. . . . It is the defendant's burden on appeal to show that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. . . .

"*Boscarino* and its progeny instruct, however, that the trial court's discretion regarding joinder is not unfettered. The determination to try a defendant jointly on charges arising from separate cases may only be reached if consistent with the defendant's right to a fair trial. In deciding whether severance is appropriate, a trial court should consider what have come to be known as the *Boscarino* factors . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 260 Conn. 486, 490–91, 798 A.2d 958 (2002). "[O]ur Supreme Court recognized three factors that must be considered in determining whether a joinder of cases is improper. These factors are (1) whether the charges involved discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial." (Internal quotation marks omitted.) *State* v. *King*, 35 Conn. App. 781, 792, 647 A.2d 25 (1994), aff'd, 235 Conn. 402, 665 A.2d 897 (1995).

In addition to agreeing with the trial court that the robberies here were similar enough to allow them to

be cross admissible, we also agree that the charges involved discrete, easily distinguishable factual scenarios. This case is very similar to *State* v. *King*, supra, 35 Conn. App. 781, in which the defendant was tried and convicted on five counts of robbery. In *King*, we agreed with the trial court that although the multiple robbery counts were similar enough to be cross admissible in the event that they were severed, they were discrete enough to be easily distinguishable to permit joinder. Id., 791–93. Here, as in *King*, each of the robberies took place on a different date, at a different location, with different victims who testified at trial and, as such, involved distinguishable and discrete factual scenarios.

We next look at whether the crimes concerned brutal or shocking conduct on the part of the defendant; see id., 792; and conclude that the facts of this case, although very serious in nature, do not evince conduct that reaches the level of brutal or shocking in today's society. Although each of the crimes was carried out with the use of firearms, which certainly frightened the victims, none of the victims was physically injured.

Last, we look at the duration and complexity of the trial; see id.; and conclude that the trial was neither long nor complex, with the state presenting twelve witnesses in a four day trial. The defendant, however, argues that the presentation of evidence by the state was so disjointed that it caused confusion: "The state presented the same triad of witnesses—victim, officer, bookkeeper—for each of the crimes, then returned to the first crime with Laurie Lasko, then revisited the second and third crimes through Sam Parisi, then returned to the second crime with Susan DeRosa. . . . This back and forth procession . . . tended to obfuscate and blur the evidence between the separate events." (Citations omitted.) The state concedes that it did not present the witnesses in chronological order, but argues, nevertheless, that the presentation was

ordered and definite and that the testimony was not complex. We agree with the state.

Our Supreme Court has instructed that "testimony need not be presented in chronological order to withstand an attack on its potential to confuse the jury." *State* v. *Greene*, supra, 209 Conn. 467. In this case, the state first offered the testimony of three witnesses relating to the May 28, 2001 robbery. This was followed by three witnesses relating to the August 10, 2001 robbery and three witnesses relating to the September 5, 2001 robbery. The state then offered the testimony of Lasko, an accomplice, who testified about the May 28, 2001 robbery, and Parisi, another accomplice, who testified about all three of the robberies. The state concluded with the testimony of DeRosa, who testified that the defendant had attempted to solicit alibi witnesses. A review of the testimony and the order in which it was presented does not lead us to the conclusion that the jury would have been confused. The trial lasted only four days, and the testimony of the witnesses was not complex.

Having examined the cross admissibility of the charges and having also applied the *Boscarino* factors, we are satisfied that the trial court did not abuse its discretion in granting the state's motion for joinder.

II

The defendant also raises a claim that the court improperly instructed the jury to consider the evidence of each case cumulatively. Specifically, the defendant argues that the "court's instruction not only failed to cure the prejudice that was incurred as a result of joinder, but actually compounded the problem by directing the jury to consider all of the evidence when making its determination as to any one charge." We do not agree with the defendant's characterization of the jury instruction.

Although he did not take an exception, the specific part of the jury instruction of which the defendant now complains, was as follows: "In law, the same actions or single course of conduct sometimes involves a commission of two or more criminal acts. Here, the claim is a robbery and the related conspiracy. And on occasion, the same evidence may be related to the several crimes. Nevertheless, you must consider whether or not the state has met its burden of proof as to these crimes—as to these crimes separately and distinctly and discreetly. That is, you must first consider when the case is given to you, from a review of all of the evidence, and determine whether or not the state has proven beyond a reasonable doubt the guilt of the defendant as to the first alleged crime of robbery in the first degree as alleged in the first count of the information. Then separately and distinctly, again from a review of all of the evidence, determine whether or not the state has proven beyond a reasonable doubt the crime of conspiracy to commit the crime of robbery in the first degree as alleged in this second count of the information and, similarly, from a review of all of the evidence, separately and distinctly consider each of the subsequent counts."

In reviewing the charge, however, it is quite clear that this part of the charge specifically related to the court's instruction concerning each individual robbery and its related conspiracy charge, and how the jury should view the evidence of robbery and the related conspiracy for each specific date, place and time. The precise instruction that immediately preceded the language of which the defendant complains specifically stated: "Now, the defendant is charged with six separate crimes in this case, three crimes of robbery and three crimes of alleged related conspiracy to commit those robberies. The charges, as you will see when you receive the information, [are] set out in six separate paragraphs

or counts. By now, you know that. The information alleges, and as the evidence [tends] to show, these crimes allege a robbery and a related conspiracy in three different fast food type restaurants *on different dates and times and places.*" (Emphasis added.)

Later in the instruction to the jury, the court went through each individual charge and explained the elements of that crime to the jury. The court explained each individual charge, the specific date and the specific place at which each crime took place. After instructing the jury on the first robbery and related conspiracy counts, the court, when beginning its instruction on the next robbery and conspiracy related counts, specifically instructed: "Again, as in the earlier charge, in order for you to convict the defendant under this count, the state must have proven beyond a reasonable doubt *separately and distinctly as to this claimed crime* the following elements." (Emphasis added.) The court gave the jury similar direction during its instruction on the final charge of conspiracy to commit robbery in the first degree: "Again, in order for you to convict the defendant in this count, you must be satisfied beyond a reasonable doubt separately and distinctly that the following things have been proven . . . ." The court went on to instruct the jury on the importance of its duty and, in so doing, further instructed: "Your verdict must be unanimous, that is, all six jurors must agree upon a verdict, be it guilty or not guilty, as to each individual count separately and distinctly." The court also instructed the jury at the start of the trial that "each offense charged must be considered separately by you in deciding the guilt or nonguilt of the defendant."

"[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The

test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citation omitted; internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 510, 828 A.2d 1248 (2003). "Barring contrary evidence . . . we must presume that juries follow the instructions given them by the trial judge." (Internal quotation marks omitted.) *State* v. *Radzvilowicz*, 47 Conn. App. 1, 32, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997); 1 B. Holden & J. Daly, Connecticut Evidence (1988) § 35, pp. 155–56. Here, the court clearly instructed the jury on several occasions that each charge was separate and distinct. Accordingly, we conclude that the court did not improperly instruct the jury to consider the evidence of each crime cumulatively, but, rather, gave adequate instructions so as to avoid juror confusion.

## III

The defendant's final claim on appeal is that he was denied a fair trial because the prosecutor engaged in at least eight instances of misconduct. Insofar as no objection was offered related to the vast majority of these instances, the defendant seeks review of the unpreserved claims pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Although we agree that the prosecutor engaged in misconduct, we conclude that the misconduct was not so severe as to deprive the defendant of a fair trial.

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contrib-

uted to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004). Our Supreme Court has held that once misconduct has been found, it is unnecessary for a defendant to seek to prevail under the specific requirements of *Golding* in these circumstances. Id., 572–73. The court explained: "The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As [the court] stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense counsel or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead . . . to confusion and duplication of effort. Furthermore, the application of the *Golding* test to unchallenged inci-

dents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of the inquiry before a reviewing court in claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis, and the specific *Golding* test, therefore, is superfluous." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 573–74. In accordance with these principles, we will review the defendant's claim to determine first whether the prosecutor engaged in misconduct and second whether the defendant's right to a fair trial was violated by such misconduct.

## A

The defendant characterizes the specific instances of alleged misconduct as falling into four prohibited categories: (1) improper expression of the prosecutor's personal opinion regarding the credibility of the witnesses or the guilt of the defendant; (2) improper implications that in order to find the defendant not guilty, the state's witnesses must be lying; (3) improper introduction of facts that were not in evidence and improper argument urging inferences based on facts that were not in evidence and (4) improper comments by the prosecutor intended to cause the jury to view the defendant's family and, therefore, the defendant negatively. We will address each of these categories in turn.

## 1

The first category of alleged prosecutorial misconduct cited by the defendant concerns the improper expression of the prosecutor's personal opinion regard-

ing the credibility of the witnesses or the guilt of the defendant. The defendant claims that the prosecutor improperly testified and vouched for Parisi, bolstered and vouched for the truthfulness of Lasko and told the jury that, on the basis of her experience, she believed that certain key witnesses were being truthful.

a

The first incident raised by the defendant occurred during the state's rebuttal argument when the prosecutor sought to explain Parisi's apparent confusion during a portion of his testimony: "This black person that [defense counsel] referred to [during closing argument] as Sam Parisi's cousin—well, if you recall [Parisi's] testimony, that's simply not true. Sam Parisi does not have a black cousin. He has a cousin who has a black boyfriend who was at [Parisi's] apartment at one point. That's improper. That's not in the evidence. And there's nothing at all remotely linking any black man to this robbery. And for you to speculate that it must be some other guy that the defendant claims was around during this is just not in the evidence and you're not to speculate on that. And it's a mischaracterization of what the testimony was. The reason Mr. Parisi was confused when he was being asked that question is because counsel kept referring to him as his cousin and he wasn't his cousin. And he didn't know what he was talking about. And that's the truth. That's the testimony. If you remember it, that's how it happened. And it's your recollection of the testimony, not the defense counsel's or mine that counts." The defendant claims that this argument by the prosecutor was improper. We agree in part.

During closing argument, defense counsel attempted to suggest that this "black cousin" may have been involved in at least one of the crimes and that Parisi was being evasive when questioned about him. However, although defense counsel repeatedly referred to Parisi's

"black cousin" during cross-examination and closing argument, Parisi testified that he did not have a black cousin, but that his cousin had a black boyfriend. The prosecutor's remarks were meant to explain the apparent confusion shown by Parisi because of defense counsel's reference to a black cousin in closing argument.

"A prosecutor is free to comment upon the evidence, including demeanor." *United States* v. *Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982). Here, during closing argument, the prosecutor simply offered the jury an alternative explanation for the demeanor of the state's witness in response to a defense argument regarding demeanor. However, although comment on demeanor is proper, "[a] prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 306, 755 A.2d 868 (2000). Here, the prosecutor stated, as fact, her explanation for Parisi's confusion and then went on to state that this explanation was "the truth." Rule 3.4 of the Rules of Professional Conduct instructs: "A lawyer shall not . . . (5) [i]n trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused . . . ." The prosecutor's statement, therefore, that the explanation offered by the state was "the truth," was improper insofar as it concerned the credibility of a witness.

b

The defendant next claims that the state attempted to bolster the credibility of Lasko when the prosecutor

stated that Lasko "gave a truthful statement to the police in the first place . . . ." The state argues that the prosecutor merely was urging the jury to use its common sense and to credit Lasko's statement as truthful. Further, the state argues that this statement was made in reference to defense counsel's argument that Lasko's testimony contained inconsistencies. We agree that this comment also was improper.

The remark regarding the truthfulness of Lasko's statement was uninvited by defense counsel. Although at times throughout closing argument, defense counsel commented on the inconsistencies in Lasko's testimony, nowhere did he impugn her truthfulness. "While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002); see also Rules of Professional Conduct 3.4 (5). We conclude that the remark in question was improper.

c

The defendant next argues that the prosecutor, just before the close of final argument, again vouched for both Parisi and Lasko when she opined that their statements were "inherently reliable information because [they have] been corroborated by other evidence." The state argues, without citation, that the statements were inherently reliable because they came from coconspirators. Regardless of whether the prosecutor's vouching concerned a coconspirator or any other of the state's witnesses, our law is clear that "[i]t is improper for a prosecutor to express his or her own opinion, either directly or indirectly, as to the credibility of witnesses." *State* v. *Jenkins*, 70 Conn. App. 515, 528, 800 A.2d 1200,

cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002). This remark was improper.

d

Last, the defendant refers to the following argument of the prosecutor in support of his claim that the prosecutor improperly vouched for witnesses and introduced her own opinion as to their veracity: "Both [Lasko and Parisi] implicated themselves in wrongdoing. And maybe because I've been in this business for a long time, it's not hard for me to see that people tend to lie to get themselves out of trouble, not to get themselves into trouble. And maybe because I've been in this business for a long time, I feel that there seems to be something inherently reliable about statements that people make that implicate themselves in wrongdoing, but I don't think it's because I've been here so long. I think it's common sense." The prosecutor went on to argue immediately thereafter: "If you have a family member or you have a child or you have anybody in your life that may not always be truthful with you, you know that they lie to get out of trouble. They don't lie to get into trouble. When they're telling you something bad that they did, it's truthful usually because they're implicating themselves. They're talking against their own penal interest. That's what both of these people did."

We do not view the prosecutor's remarks here, suggesting that the accomplices had no reason to lie, as being based on personal opinion or as an improper attempt to bolster the credibility of these witnesses. Rather, the remarks are based on the ascertainable motives of the witnesses. See *State* v. *Stevenson*, supra, 269 Conn. 585. Our Supreme Court has held that "[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie, or not to lie, as

the case may be." (Internal quotation marks omitted.) Id. The remark, therefore, was not improper.

2

The defendant next claims that the state improperly implied that in order to find him not guilty, the jury had to conclude that the state's witnesses must be lying. Specifically, the defendant argues that the prosecutor implied that if the defendant were innocent, then Lasko and Parisi must have been lying. We do not agree.

The defendant cites to the following specific language in support of his claim: "And this red herring that has been thrown in that there's some other person out there that could possibly have been—being protected by Sam Parisi falls flat on its face. Because you know why? Because that means Laurie Lasko would have been trying to protect someone, too. And just by chance when they were interviewed separately, they both implicated [the defendant] falsely. They just picked him out and falsely implicated him. And so, she must be trying to protect somebody. And [Parisi] must be trying to protect somebody. And by some fortuitous or unfortunate circumstance, they both picked the same person to insert in there." The defendant claims that this argument created for the jury a "logically false either-or" scenario concerning the ultimate issue of fact. We do not agree.

"[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof." (Internal quotation marks omitted.) *State* v. *Tate*, 85 Conn. App. 365, 371, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004). Nevertheless, "[i]n a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue that one of the two

sides is lying. . . . While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Jefferson*, 67 Conn. App. 249, 271, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002); see also Rules of Professional Conduct 3.4 (5).

During this part of the state's closing argument, the prosecutor did not, as the defendant contends, impliedly tell the jury that it had to conclude that both of these witnesses were lying in order to find the defendant not guilty, nor did she express her personal views of the evidence or vouch personally for the truth and veracity of these witnesses. The prosecutor set forth the circumstances of the witnesses' statements and asked the jury to weigh the evidence and use its common sense to determine whether both of these witnesses were lying. The defendant certainly sought to attack the credibility of the state's witnesses during cross-examination and in closing argument. We have held that in such circumstances, it is neither inappropriate nor improper for the prosecutor to present alternatives to the jury in contrast to a defendant's implication that the state's witnesses had reasons for lying. *State* v. *Jefferson*, supra, 67 Conn. App. 272. We conclude that the statements were not improper.

3

The next category of alleged prosecutorial misconduct claimed by the defendant concerns the improper introduction of facts that were not in evidence and improper argument urging the jury to draw inferences on the basis of facts that were not in evidence. The defendant cites two instances.

a

The defendant claims that the following rebuttal argument was improper: "And I submit to you, if you look

at the defendant and you just saw his eyes, you would have really no way of knowing exactly what his race was." The defendant argues that this had the effect of forcing him to testify despite his never taking the witness stand, and he claims that he was penalized by the mere fact that he attended his trial. The state argues that the jury is always entitled to view the defendant, and the defendant's continued contention that these crimes were committed by a black man, and not by him, warranted this argument by the prosecutor. We agree with the state that this comment was not improper.

"From a constitutional standpoint, it is well-established that a person may lawfully be compelled to exhibit or demonstrate physical characteristics." *United States* v. *Jackson*, 476 F.2d 249, 253 (7th Cir. 1973) (there is no statute prohibiting prosecutor from commenting on nontestifying defendant's appearance change). "[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Holt* v. *United States*, 218 U.S. 245, 252–53, 31 S. Ct. 2, 54 L. Ed. 1021 (1910).

During the defendant's closing argument, counsel repeatedly referred to the fact that several of the witnesses to two of the robberies thought that at least one of the assailants was black. Counsel argued that it was only the Taco Bell robbery that clearly involved two white assailants and that if the defendant were to make up an alibi, he would have made something up concerning the Taco Bell robbery because it involved only white assailants: "In two of the cases, there's a black person that's allegedly involved. However, in one, in Taco Bell, it's two white people. And that's the one where someone is going to say that two white people were there and,

Mr. Fauci, you're a white person and the other person is a white person. . . . Wouldn't you if you were contriving for coming up with alibis, wouldn't you come up with the alibi for Taco Bell?" Defense counsel also argued: "Don't punish [the defendant] because you don't like the way he looks. He looks different, and you may think he looks the type." Because defense counsel argued that the defendant was not the assailant because he was white and the masked assailant most closely matching his physical description may have been black, it was not improper for the prosecutor to respond to this argument during rebuttal.

b

The defendant also claims that the state improperly introduced facts that were not in evidence regarding one of his alibi witnesses during rebuttal closing argument. He argues that the state improperly attempted to impeach one of his alibi witnesses, Lazarus Dimitriadis.

During the trial, Dimitriadis testified that he, his niece and the defendant had driven to New York. Dimitriadis then refused to disclose the name of a woman that he met after getting to New York, stating that she did not want to be involved. During rebuttal, the prosecutor argued that when Dimitriadis spoke to the state's investigator on March 13, 2003, "he also admitted [that] four of them . . . left from Norwalk and went down to New York. And he admitted that. And that the woman—the other woman didn't want to get involved. Well, we know she didn't want to get involved because it was Susan DeRosa. She was already asked to give a false alibi, which she refused. And not until after he said that to the state investigators and realized that Susan DeRosa was going to be a witness at the trial did he come at trial and change what he had to say, that he didn't meet the woman until she was down there. The mystery woman in New York who he doesn't want to give the

name to." The defendant argues that through this argument concerning facts that were not in evidence, the state attempted to impeach Dimitriadis through one of its witnesses, DeRosa, who testified on consciousness of guilt and similar matters. The state argues that the prosecutor was not trying to imply any secret knowledge about DeRosa's whereabouts, but that she was urging the jury to draw reasonable inferences from the evidence. A review of the record, however, clearly shows that DeRosa specifically testified that she was not in New York with Dimitriadis. Additionally, we can find no testimony that reasonably implies anything to the contrary. Accordingly, we agree with the defendant that the state improperly argued facts not in evidence or reasonably drawn therefrom.

c

The final claim of prosecutorial misconduct concerns allegedly improper comments that were intended to cause the jury to view the defendant's family and, therefore, the defendant negatively. Specifically, the defendant argues that the prosecutor elicited irrelevant and inflammatory evidence from Lasko on redirect examination and cites the following:

"Q. And the part where you [Lasko] weren't telling the truth about Tony's [the defendant's brother's] involvement, you've already indicated you had a reason for that.

"A. Yes.

"Q. What was your basis for being afraid of Tony?

"A. He told me that if was ever to rat on him—I'm sorry—if I was ever [to] rat on his brother that he would put my mother in a room and torture her for—

\* \* \*

"[Defense Counsel]: I object to what Tony said because—wasn't present.

"The Court: Thank you. All right. Since you opened the door about the validity of her confessions—of her statement to the Orange police, I'll overrule the objection.

"[Defense Counsel]: Your Honor—

"The Court: I overruled the objection. Exception noted."

The defendant argues that this testimony "was damaging, irrelevant, an attempt to garner sympathy, an attempt to demonize the defendant's family" and that it was misconduct. The state argues that it was permissible for the prosecutor to rehabilitate its witness when defense counsel had challenged her credibility on cross-examination. We agree with the state.

Here, the defendant attempted to impeach and to discredit Lasko by drawing attention to her failure to mention Tony in her signed confession. When pressed by defense counsel as to why she failed to mention Tony, Lasko testified that it was because she was afraid of him.

A party who initiates discussion of an issue, whether on direct or on cross-examination, cannot later object when the opposing party so questions the witness. *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986). "The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Citations omitted; internal quotation marks omitted.) Id.

The court did not abuse its discretion in permitting the challenged line of inquiry during rebuttal. The court correctly ruled that the defendant had "opened the door" by eliciting the testimony concerning Lasko's failure to mention Tony because she was in fear of him.

B

Having concluded that four of the instances cited by the defendant were indeed misconduct,[2] we next determine whether that misconduct deprived the defendant of his due process right to a fair trial. *State* v. *Stevenson*, supra, 269 Conn. 572. The defendant claims that these instances of cited misconduct deprived him of a fair trial under each of the *Williams* factors; see *State* v. *Williams*, supra, 204 Conn. 540; in that: (1) he did nothing to invite the misconduct; (2) the misconduct was severe; (3) the misconduct was frequent; (4) the

---

[2] In *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), Justice Shea, a man blessed with vast experience at the bar and on the bench, recognized that reversal of a conviction where prosecutorial misconduct has occurred usually is not desirable. He wrote that: "We recognize that the reversal of a criminal conviction in the exercise of a court's supervisory authority must not be undertaken without balancing other interests which may be involved. *United States* v. *Hasting*, 461 U.S. 499, 103 S. Ct. 1974, 1979, 76 L. Ed. 2d 96 (1983). The trauma which the victim of a heinous crime might undergo by being forced to relive a harrowing experience or the practical problems to be encountered in retrying a case several years after the event require a cautious approach." *State* v. *Ubaldi*, supra, 572. Yet, where unchecked professional misconduct occurs in closing arguments, it can poison the atmosphere in a criminal case, and, left unchecked, it can reward the irresponsible who hope to benefit by flouting the rules and can punish those who obey them. Where the misconduct occurs and the trial judge, as a minister of justice, intervenes in a timely way and gives a proper curative instruction, the problem is cured. See *State* v. *Reid*, 193 Conn. 646, 666, 480 A.2d 463 (1984); *State* v. *Bunleut*, 82 Conn. App. 648, 655, 846 A.2d 912, cert. denied, 270 Conn. 904, 853 A.2d 522 (2004); *State* v. *Doriss*, 84 Conn. App. 542, 547–48, 854 A.2d 48, cert. denied, 271 Conn. 922, 859 A.2d 581 (2004); *State* v. *Guzman*, 73 Conn. App. 683, 695, 809 A.2d 526 (2002), cert. denied, 262 Conn. 937, 815 A.2d 137 (2003). Future misconduct is also discouraged. We encourage trial judges to so proceed under appropriate circumstances.

misconduct was central to the critical issues in this case; (5) the court did not adopt any curative measures; and (6) the state's case was very weak. We disagree.

First, we must determine whether the misconduct was somehow invited by the defense. See id. Reviewing each of the defendant's cited instances of misconduct, as addressed previously, we conclude that some of these instances were invited by defense counsel. The remaining instances, however, were not invited.

The severity of the misconduct is the second factor that we must consider. See id. In *Williams*, "our Supreme Court has set a high bar. See *State* v. *Thompson*, 266 Conn. 440, 479–80, 832 A.2d 626 (2003). In *Thompson*, our Supreme Court reviewed and found improper the prosecutor's repeatedly calling the defendant a 'killer'; id., 472; calling the testimony of the defendant's two principal witnesses 'reprehensible,' saying that they were 'lying'; id., 465; and lacked both 'moral fortitude' and a 'conscience,' lived in a 'twisted world,' were not 'stand-up enough guy[s],' let misguided loyalty to a friend influence their testimony and that by it, they had 'reserved a place in hell for themselves' . . . were truthful in their earlier, recanted pretrial statements and that to believe their trial testimony, jurors had to believe that the state's witnesses had lied. . . . The *Thompson* court also found that the prosecutor improperly importuned the jury to give the victim's family justice by convicting the defendant . . . and, finally, that he improperly urged the jury to use impeachment evidence against a third defense witness substantively. . . . The [*Thompson*] court found that this misconduct 'was not, for the most part, severe.' " (Citations omitted.) *State* v. *Doriss*, 84 Conn. App. 542, 546, 854 A.2d 48, cert. denied, 271 Conn. 922, 859 A.2d 581 (2004). On the basis of the standards set forth in *Thompson*,

which constrain our review, we conclude that the defendant has failed to satisfy the severity prong of *Williams*.

The frequency of the misconduct is the third factor for our consideration. See *State* v. *Williams*, supra, 204 Conn. 540. The defendant cited eight instances of alleged misconduct of which we have concluded that four were improper. They were brief instances and were not particularly frequent.

We next look to whether the misconduct went to the centrality of the issues in the case. Id. The issues to be decided by the jury, in large part, depended on weighing the credibility of Parisi, Lasko and DeRosa against the defendant's alibi witnesses, Dimitriadis and Denitra Samlidis. Because the jury was required to choose between the state's case and the defendant's alibi, the credibility of each side's witnesses was central to the jury's determination of guilt.

We next look to whether the court adopted curative measures. See id. Here, the defendant did not request the court to give any curative instructions. We recognize, however, that the court specifically asked defense counsel if he had any exception to its instruction, and counsel asked for clarification only on consciousness of guilt, to which the court complied. Although the defendant did not request curative measures, the court did instruct the jury on its duty to find the facts, to weigh the evidence and to decide the case solely on the evidence, the testimony and the exhibits. The court also told the jury that arguments and statements made by the attorneys were not evidence and that it was the jury's role to determine the credibility of witnesses. Additionally, the court instructed the jury that Lasko and Parisi were accomplices of the defendant and that the jury should consider that when weighing their credibility.

The final factor to which we look requires that we consider the strength of the state's case. See id. The state's case rested on the testimony of its witnesses, including the victims, which in many instances corroborated the testimony of the accomplice witnesses. There was no physical evidence linking the defendant to these crimes, and none of the witnesses could positively identify any of the robbers. Nevertheless, this does not mean that the state presented a weak case. Two of the defendant's accomplices testified against him, placing him at each of the robberies. They explained the events surrounding the robberies, and much of their testimony was corroborated by the victims. Additionally, DeRosa testified that the defendant had asked her to provide a false alibi for him. The state's case, therefore, was not weak.

C

"The ultimate question is, in light of the conduct that we have concluded was improper, whether the trial as a whole was fundamentally unfair and [whether] the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . . In making that determination, [t]he fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Citation omitted; internal quotation marks omitted.) *State* v. *Tate*, supra, 85 Conn. App. 377. Looking at the effect of the improper remarks made by the prosecutor in the framework of the entire trial, including the court's instruction, we are not convinced that the defendant was deprived of the right to a fair trial.

The judgments are affirmed.

In this opinion the other judges concurred.